Ray MARSHALL, Secretary of Labor,
United States Department of Labor,

v.

The BALTIMORE AND OHIO RAIL-
ROAD COMPANY and the Chesapeake
and Ohio Railway Company.

Civ. A. No. N–74–637.

United States District Court,
D. Maryland.

Sept. 6, 1978.

On Motion for Partial Reconsideration
Dec. 5, 1978.

Carin Ann Clauss, Sol. of Labor, Washington, D. C., Marshall H. Harris, Regional Sol., Kenneth L. Stein, Deputy Regional Sol., Joan M. Roller, Philadelphia, Pa., and Thomas J. Allen, Washington, D. C., on the briefs; Russell T. Baker, Jr., U. S. Atty. for the District of Maryland and Daniel Clements, Asst. U. S. Atty., Baltimore, Md., for plaintiff.

Joseph B. Geyer, Gen. Atty., Fenton L. Martin and H. Russell Smouse, of Baltimore, Md., and Thompson Powers, Ronald S. Cooper and Morgan D. Hodgson, Michael P. Berman, Washington, D. C., for defendants.

NORTHROP, Chief Judge.

This action was filed on behalf of the Secretary of Labor on June 19, 1974. In the complaint, the Department of Labor (Department) charged the Baltimore and Ohio Railroad Company (B & O) and the Chesapeake and Ohio Railway Company (C & O) with violating Section 4 of the Age Discrimination in Employment Act of 1967, (29 U.S.C. § 621 *et seq.*). Counsel for both plaintiff and defendant railroads have submitted the following issues to this Court for resolution:

(1) Whether the Department satisfied the conciliation requirement of the Age Discrimination in Employment Act prior to filing his complaint; and if not, the legal effect of the parties' subsequent conciliation discussions.

(2) Whether the Secretary's complaint includes individuals terminated from non-contract status after March 1, 1972.

(3) Whether the selection in the force reduction of the 142 individuals at issue on the basis of their entitlement to an unreduced pension under defendants' pension plans constituted discrimination on the basis of age in violation of Section 4(a) of the Act.

(4) Whether the termination of 142 employees at issue was exempt under the Act by virtue of Section 4(f)(2).

(5) Whether the lowering of the mandatory retirement age under defendants' pension plans from 65 to 62 constituted discrimination on the basis of age in violation of Section 4(a) of the Act.

(6) Whether the retirement of employees at the mandatory age of 62 under defendants' pension plans, as amended in 1972, was exempt under the Act by virtue of Section 4(f)(2).

(7) Whether, based on their reliance on written interpretations of the Act by the Department, defendants are exempt from any liability in this action by virtue of Section 10 of the Portal-to-Portal Act of 1947, 29 U.S.C. § 259 (1970).

Issues (1) and (2) were tried on April 27 and 28, 1978. The remaining issues were tried on May 17–25, 1978. Counsel for both plaintiff and defendants have submitted exhaustive pretrial and post-trial memoranda. Prior to the disposition of the above issues, the Court will outline the relevant background facts in this case in conformance with the mandate of Rule 52 of the Federal Rules of Civil Procedure. Additional facts will be added throughout the opinion where necessary.

### Facts

■ Defendant railroads are common carriers engaged in the transportation of freight by rail. It is clear that they are employers affecting commerce within the meaning of Section 11(b) of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 630(b).

On December 17, 1962, the Interstate Commerce Commission approved the acquisition by C & O of B & O through the purchase of B & O capital stock, effective February 4, 1963. Thereafter, the management of the railroads was consolidated.

In 1971, a nationwide coal strike by the United Mine Workers Union precipitated several actions by defendants. Since this suit concerns, *inter alia*, the legality of defendants' response to the strike, the facts underlying the decisions made by defendants' management must be explored.

During the years preceding 1971, defendants' financial position was declining. During the period 1965–70, the defendants' level of traffic had not increased, and their expenses had increased more rapidly than their revenues.

The defendants' declining financial position was reflective of the general trends in the railroad industry, particularly in the Northeast. This situation was accentuated by the failure of the Penn Central Railroad which went into receivership in June 1970.

In April 1971, Mr. Hays T. Watkins became President and Chief Executive Officer of defendants. Mr. Watkins believed that the existing economic and financial situation required that defendants streamline their operations and eliminate unnecessary expenses. To achieve this goal, Mr. Watkins established two priorities: the abandonment of unprofitable branch lines and a reduction in the size of the work force. Steps were taken immediately to carry out these objectives.

The goal of reducing the size of the work force was based upon top management's belief that defendants had too many employees relative to their level of traffic. This overstaffing was present to approximately the same extent in both the contract (union) and non-contract (supervisory personnel) ranks.

In September 1971, Mr. Norman Halpern became Assistant Vice President—Executive Department. In order to implement the reduction of staff, he ordered that no new non-contract employees could be hired without the specific approval of Mr. Watkins. Other methods for reducing the work force were discussed.

On October 4, 1971, a nationwide coal strike began. Although defendants were aware that the contract between the United Mine Workers Union and the coal operators would expire on September 30, 1971, they did not anticipate a strike since there had not been a nationwide coal strike since 1949. Moreover, early indications were that the parties would be able to agree on a contract and thus avoid a strike.

The coal strike represented a severe financial threat to defendants since coal constituted approximately 50% of defendants' traffic and 35–40% of their operating revenue. Since it appeared that the strike would be protracted, defendants believed that they were required to take immediate action to reduce expenses.

The first step taken by defendants involved a reduction in their contract work force which comprised 93% of defendants' employees. Although defendants furloughed many employees in order to cut down expenses, defendants also decided to reduce their contract work force by approximately 20%. Management subsequently decided that a comparable reduction in the non-contract work force was necessary.

Meetings by defendants' top management resulted in a program for reducing the size of the work force. Preliminarily, all poor performers were eliminated, but this resulted in only a 1% reduction. The next step was an attempt to eliminate as many jobs as possible and to consolidate the rest.

One of the criteria used to select individuals to be terminated was "pension entitlement." Through pension entitlement, management designated individuals who were entitled to substantial pension benefits if terminated. Management decided that it would be preferable to terminate these employees since they would be less adversely affected by the loss of a job than individuals who were not entitled to receive pension benefits. In this way management hoped to reduce the impact upon employees who were let go. Out of the employees terminated in this reduction, 142 were selected because of their entitlement to pension benefits.

Although other methods of reducing the size of the work force were considered, they were rejected either because they were not suited to a solution of defendants root problem (overstaffing) or because of the lack of empirical data necessary to implement them. For example, defendants did not attempt to merely furlough many of their employees since one of defendants' basic problems was their overstaffed condition. Neither did defendants attempt to rank their employees by performance since such an attempt would not have been practical.

During the period of time in which the feasibility of using pension entitlement as a criterion for selecting employees for termination was discussed, defendants' law department was consulted as to the legality of the proposed reduction. At that time Mr. Owen Clarke was defendants' Vice President of Personnel and Labor Relations and an experienced attorney. Mr. Frank Householder was an Assistant Vice President in charge of Equal Employment Opportunity Services. Messrs. Clarke and Householder discussed the effect of the ADEA upon the proposed reduction. They concluded that, based upon published opinions of the Wage-Hour Administrator, the proposed reduction was exempted from the ADEA under the provisions of § 4(f)(2). This determination was relayed to Mr. Watkins and relied on by top management in deciding to go forward with the reduction.

The reduction of employees took place in accordance with the above plans. During mid-October 1971 to March 1, 1972, most of the employees were terminated, although some of them were carried on defendants' payroll for some time later.

On November 15, 1971, the coal strike ended. Defendants' Board of Directors advised their stockholders that, as a result of the coal strike, defendants would not pay any dividend for the fourth quarter of 1971. This represented the first occasion since 1922 that defendants had failed to pay a dividend.

In December 1971, the Department instituted an investigation into alleged viola-

tions of the ADEA by defendants. This investigation was undertaken by Assistant Area Director Anthony Kiggins.

Mr. Kiggins met with several of defendants' officers in early 1972 to talk over the legality of defendants' reduction in force. During the course of several meetings, information was provided by defendants and both sides discussed the reduction and defendants' legal defenses. After a meeting on March 13, 1972, in which Mr. Kiggins informed defendants of his conclusion that they had violated the ADEA, he referred the investigative file to his Regional Solicitor.

Shortly thereafter, defendants began considering another method of reducing the size of their work force. Mr. Clarke, who had become defendants' principal legal officer on May 1, 1972, undertook consideration of lowering the mandatory retirement age from 65 to 62 under defendants' pension plans.

Mr. Clarke was aware of an opinion letter written by the Wage-Hour Administrator, dated September 6, 1968, which he interpreted to hold that the reduction in a mandatory retirement age under a pension plan from 65 to 62 did not affect the availability of the exemption in Section 4(f)(2) of the ADEA. Accordingly, when defendants' management consulted the Law Department, they were advised that such a reduction would be lawful. On October 16, 1972, defendants' Board of Directors approved amendments to the pension plans which lowered the mandatory retirement age from 65 to 62. These amendments were to take effect on January 1, 1974.

On January 23, 1973, Mr. Kiggins met with several of defendants' officers to obtain further information in reference to the Department's investigation. The investigative file and the additional data were subsequently reviewed by the Office of the Regional Solicitor in Philadelphia.

No further contact was had between the parties until December 1973. Several meetings between attorneys for both sides occurred between December 1973 and June 1974. At these meetings, the Department informed defendants that it believed that its investigation disclosed violations of the ADEA. Defendants responded by asserting their legal defenses and offering additional information. On June 19, 1974, the Department filed the complaint in this case charging defendants with willful violations of the ADEA.

Defendants moved to dismiss the complaint on July 22, 1974, alleging that the Department had failed to conciliate the matters alleged in the complaint as required by law. On November 8, 1974, this Court heard oral argument on the motion to dismiss. This Court ordered the parties to engage in further conciliation. The parties did subsequently attempt to conciliate the claims and now agree that adequate efforts to conciliate have been made.

## Law

### I. The Adequacy of Conciliation and this Court's Jurisdiction

Section 7(b) of the ADEA, 29 U.S.C. § 626(b) provides in pertinent part:

Before instituting any action under this section, the Secretary shall attempt to eliminate the discriminatory practice or practices alleged, and to effect voluntary compliance with the requirements of this chapter through informal methods of conciliation, conference, and persuasion.

Almost immediately after the Department filed its complaint, defendants responded with a motion to dismiss alleging that the Department had failed to satisfy this requirement. This Court then directed the parties to further conciliate and they have done so. Defendants have renewed their previous motion, however, and alleged that it is "jurisdictional."

Defendants' position may be summarized as follows. Section 7(b) requires the Department to engage in exhaustive and thorough efforts to conciliate alleged violations of the Act prior to filing suit. The Department's actions in this case, which consisted of an investigation followed by months of inaction culminating in three very short conferences, fails to satisfy this burden.

The stay issued by this Court is ineffective to cure the inadequacy of the Department's pre-complaint activities since Section 7(b) is a mandatory provision requiring conciliation as a jurisdictional condition precedent to suit. Accordingly, the action should be dismissed or considered timely filed only as of the date the post-complaint discussions were completed.

The Department responds that reasonable efforts to conciliate this case were in fact attempted and were met with rebuffs from defendants. In the alternative, the Department argues that this Court's Order staying the proceedings until conciliation had been effected was the proper course since Section 7(b) is not jurisdictional.

The facts surrounding the pre-complaint conciliation efforts are somewhat muddled, although attorneys for both sides testified. Both sides agree that Mr. Kiggins had several investigatory meetings with defendants' officers. They agree that a closing conference was held on March 13, 1972 between Mr. Kiggins and defendants' representatives. The next meeting was held on January 23, 1973 when Mr. Kiggins requested additional information from defendants. The parties are in further agreement that on December 26, 1973 a meeting for the purpose of conciliation was held between attorneys for both sides. The parties followed this meeting with meetings on February 21, 1974 and May 30, 1974. During this time defendants agreed to toll the statute of limitations.

This Court has determined that it will adopt both aspects of the November 8, 1974 decision:

(1) The Department's pre-complaint conciliation efforts were inadequate to satisfy Section 7(b) of the Act; and

(2) the Court has the discretion to retain jurisdiction of the case while adequate conciliation is effected.

The Court cannot agree with the Department's contention that its pre-complaint actions satisfied the statute. The chronology of the actions leading up to the filing of the complaint indicate that after Mr. Kiggins informed defendants of his opinion that they had violated the Act, no meaningful discussions were held between the parties for almost two years. Moreover, despite the fact that numerous employees were involved, the three conciliation meetings were very short and the other correspondence was anything but comprehensive. Although defendants did not agree with the Department's legal assessment of the case and raised issues which are similar to the ones that are to be decided in this opinion, it is significant that they agreed to toll the statute of limitations while discussions took place. Accordingly, the Court cannot accept the Department's assertion that they were faced with a totally recalcitrant employer who refused to come into compliance. Conciliation and settlement is a two-way street—the defendants are not required to either surrender completely or face suit if they are willing to informally discuss the case and toll the statute of limitations to prevent prejudice to the Department.

The Department's citation of *Hodgson v. Approved Personnel Service, Inc.*, 529 F.2d 760 (4th Cir. 1975) is also not persuasive. In that case, the Fourth Circuit held that Section 7(b) was satisfied by five contacts with defendants over a period of four years. The case, however, turned on the fact that defendant had made repeated assurances to the Department that it would obey the law followed by further violations. In the instant case, the Department was met with the companies' legal defenses, and consequently additional informal methods of conciliation were required.

Although this Court does not agree with defendants' assertion that the Department's conciliation efforts must be "exhaustive," it does appear to the Court that they should at least afford the employer the opportunity to discuss the individual circumstances surrounding the alleged violations. A recent opinion by Judge Blumenthal, *Marshall v. Hartford Fire Insurance Co.*, 78 F.R.D. 97 (D.Conn.1978) provides a thorough analysis of the Department's burden in ADEA cases. Judge Blumenthal held, *inter alia*, that a defendant

should be given an opportunity to respond to the Department's charges, and to discuss cases individually. If it appears that defendants are using this individual discussion as a tactic to delay, however, the Department may be justified in taking other actions. *Marshall v. Hartford Fire Insurance Co., supra* at 106–07. The court concluded that the ten full days of negotiation was an adequate amount of time to discuss the 72 cases of age discrimination charged by the Department. This Court accordingly concludes that the conciliation attempts by the Department, particularly in a case of this magnitude (coupled with defendants' willingness to toll the statute of limitations) were inadequate to satisfy Section 7(b). *See Marshall v. Hartford Fire Insurance Co., supra* and cases cited therein.

■ The Court is of the opinion, however, that this defect was cured by the subsequent extensive conciliation undertaken by the parties. The defendants concede that the parties' post-complaint efforts would have been sufficient to satisfy the statute if they had occurred prior to the filing of the complaint. They argue that the Department's failure to engage in this conciliation *prior* to the filing of the complaint deprives this Court of jurisdiction.

There is a split of authority on the question of whether Section 7(b) is jurisdictional. *Compare Usery v. Sun Oil Co. (Delaware)*, 423 F.Supp. 125 (N.D.Tex.1976); *Dunlop v. Resource Sciences Corp.*, 410 F.Supp. 836 (N.D.Okl.1976) (holding requirement is jurisdictional) *with Brennan v. Ace Hardware Corp.*, 495 F.2d 368 (8th Cir. 1974) (dictum); *Brennan v. Texas Instruments, Inc.*, 12 FEP Cases 1724 (E.D.Ky. 1976); *Dunlop v. Sandia Corp.*, 13 FEP Cases 128 (D.N.M.1975) (staying actions). Indeed, one case which held that the requirement was jurisdictional (*Usery v. Sun Oil Corp., supra*), cited as support a case which states that a district court has the discretion to stay an action while the parties attempt conciliation (*Brennan v. Ace Hardware Corp., supra*).

■ This Court believes that the more preferable approach is to stay the action while conciliation is attempted. This approach prevents the harsh consequences of dismissal and yet allows the parties to engage in statutorily mandated conciliation. Moreover, it finds support in Section 7(b) itself which provides in pertinent part that

> The court shall have jurisdiction to grant such legal or equitable relief as may be appropriate to effectuate the purposes of this chapter . . . .

The Court consequently finds that it has equitable power to stay the action in order to provide an opportunity for conciliation to take place.

Defendants' only argument in contravention of this holding is that it "excuse[s] gross inadequacies by the Department in fulfilling its statutory mandate" and therefore encourages the Department not to comply with a mandatory prerequisite to filing suit. The Court does not believe that it is faced with that situation here. It is true that the Department's representatives were overly heavy-handed in their conciliation attempts and that their attempts were not sufficiently comprehensive. However, this is not a case where the Department filed suit without making any attempts to conciliate at all. The Court cannot acquiesce in defendants' characterization of the conciliation efforts as "grossly inadequate." The Court is confident that the Department in the future will attempt more fully to conciliate alleged violations. Moreover, since extensive conciliation has been achieved in this case through informal bargaining by both sides, it is clear that the spirit of the statute has not been violated. For all of these reasons, this Court finds that it has jurisdiction over the case and properly stayed the action in November 1974.

## II. *Scope of the Complaint*

The Department's complaint reads in pertinent part:

### IV.

Defendants; employers subject to the provisions of Section 4(a) of the Age Dis-

crimination in Employment Act, have, since on or about January 1, 1971, willfully violated and are violating the provisions of Section 4(a)(1) of the said Act and Section 15 of the Fair Labor Standards Act, by discharging, refusing to hire, demoting, and/or otherwise discriminating against in excess of 300 employees at numerous locations and places of business of the defendants in at least four different states, because such individuals were between the ages of 40 and 65.

. . . . .

WHEREFORE, cause having been shown, plaintiff prays for judgment . . setting aside the amendment to the pension requiring retirement at age 62; and for such other damages as a result of the willful nature of the violations, and for costs of this action.

Defendants advance two arguments that allegedly prevent the Department from challenging the legality of defendants' reduction of the mandatory retirement age: (1) that the total lack of conciliation as to this issue mandates dismissal under Section 7(b) of the Act; and (2) that "the complaint does not comprehend these additional claims." These contentions may be quickly dealt with.

■ Since this Court has already held that it has discretionary power to order a stay to allow both sides to effect conciliation, contention (1) is without merit. It is likewise clear that contention (2) is meritless. The portions of the complaint quoted above satisfactorily put defendants on notice that the Department was putting the retirement age reduction at issue. Rule 8, Fed.R.Civ.P.

■ The Court is unaware of the details of the extensive and comprehensive discussions between counsel. Thus, the Court cannot with certainty determine whether the Department will allege that other violations of the Act are encompassed by its somewhat broad complaint. However, this Court will not find that any acts subsequent to the 1974 complaint are covered, unless the Department can show some nexus between the alleged post-complaint violations and the actions which led to the filing of this complaint. Consequently, the Court finds that employees affected by the reduction of the mandatory retirement age are included within the purview of this complaint, at least insofar as they contest the companies' authority to retire them at age 62 without their consent.

### III. Whether the Companies' Involuntary Retirement of 142 Employees Violated Section 4(a)

Section 4(a) of the Act, 29 U.S.C. § 623(a)(1) provides that

It shall be unlawful for an employer—
(1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age.

■ Defendants assert that the legislative history of the ADEA shows that Congress only intended to prohibit "arbitrary, unreasonable decisions based on age." However persuasive this argument may be, it is a settled canon of statutory interpretation that courts will resort to legislative history only when confronted by ambiguous legislation. It cannot be said that the above statute is ambiguous, hence this Court must attempt to enforce the literal language embodied within it.

Defendants next contend that plaintiff must "show more than simply the fact that he was within the protected age group and that he was adversely affected by an employment decision." Citing Bishop v. Jelleff Associates, 398 F.Supp. 579, 593 (D.D.C. 1974). Defendants concede, however, that recent decisions in the Fifth Circuit have adopted a more liberal standard for establishing a prima facie case. See Price v. Maryland Casualty Co., 561 F.2d 609, 612 (5th Cir. 1977); Marshall v. Goodyear Tire & Rubber Co., 554 F.2d 730 (5th Cir. 1977). For example, in Wilson v. Sealtest Foods Division of KraftCo. Corp., 501 F.2d 84 (5th Cir. 1974) the court held that a showing that an employee was within the protected

age group (age 40–65, 29 U.S.C. § 631), was asked to take early retirement against his will, and was replaced by a younger person was enough to establish a prima facie case. Similarly, in *Laugesen v. Anaconda Co.*, 510 F.2d 307 (6th Cir. 1975), the Court held that, if one of the factors which caused the decision to terminate an employee was age bias, a prima facie case had been presented.

 Defendants argue that *Price v. Maryland Casualty Co., supra* establishes that a prima facie case is made out where a plaintiff proves: (1) that he was a member of the protected group; (2) that he was discharged; (3) that he was replaced with a person outside the protected group; and (4) that he was qualified to do the job. Defendants contend that the third criterion of the above test is missing in this case since most of the employees were replaced by employees who were younger but still in the protected group. The Court does not find this to be a very compelling argument. Accepting this test literally would prevent even blatant and willful violations of the Act by an employer as long as he had a replacement employee who was over 40. Accordingly, this Court will not adopt defendants' contention but will find that the Department has established a prima facie case.

The Court notes that defendants have included in their argument that the Department did not meet its burden, arguments which relate to a Section 4(f)(1) defense. Section 4(f)(1) of the Act provides in pertinent part:

It shall not be unlawful for an employer, employment agency, or labor organization—

(1) to take any action otherwise prohibited . . . where the differentiation is based on reasonable factors other than age. 29 U.S.C. § 623(f)(1).

 The Court is of the opinion that this section represents an affirmative defense which defendant has the burden of proving. In *Arritt v. Grisell*, 567 F.2d 1267 (4th Cir. 1977), the Fourth Circuit held that the employer has the burden of proving a Section 4(f)(1) defense. Although Judge

Thomsen's opinion was concerned with another section of 4(f)(1) (the bona fide occupational qualification defense), the principle that the Court gleans from this case is that the defenses set forth in Section 4(f) are separate from 4(a). Consequently, consideration of whether the Department has met its burden under 4(a) does not involve 4(f)(1). *Cf. Arritt v. Grisell, supra; McMann v. United Air Lines, Inc.*, 542 F.2d 217, 219 n. 3 (4th Cir. 1976), *rev'd on other grounds* 434 U.S. 192, 98 S.Ct. 444, 54 L.Ed.2d 402 (1977). *But see Price v. Maryland Casualty Co., supra.*

In any event, the availability of the 4(f)(1) defense is inextricably bound up in the more important question of whether the defendants have shown a 4(f)(2) defense since both depend upon the question of pension entitlement. Accordingly, the Court will deal with this issue, *infra.*

### IV. Whether the Companies' Involuntary Retirement of 142 Employees Is Exempt Under Section 4(f)

Section 4(f)(2) of the Act, 29 U.S.C. § 623(f)(2) provides in pertinent part:

It shall not be unlawful for an employer

. . .

(2) to observe the terms of a bona fide seniority system or any bona fide employee benefit plan such as a retirement, pension, or insurance plan, which is not a subterfuge to evade the purposes of this chapter, except that no such employee benefit plan shall excuse the failure to hire any individual.

Both sides agree that there are three elements to this exemption, which is available when an employer:

(1) observes the terms

(2) of a bona fide retirement plan

(3) that is not a subterfuge to evade the purposes of the Act.

The Supreme Court has interpreted Section 4(f)(2) in *United Air Lines, Inc. v. McMann*, 434 U.S. 192, 98 S.Ct. 444, 54 L.Ed.2d 402 (1977). In that case the issue before the Court was whether defendant's

forced retirement of plaintiff at age 60 pursuant to its pension plan was exempted from the ADEA by Section 4(f)(2). The High Court held that the plan was not a "subterfuge" since it had existed prior to the enactment of the ADEA. The Court concluded that the exemption was available to United since it had observed the terms of a concededly bona fide pension plan. This Court will therefore examine the above elements in light of *McMann*.

## A. *"Observing the Terms"*

The Department argues that defendants did not observe the terms of their plan in terminating these employees since the plans did not expressly set forth defendants' right to do so. Defendants counter, and the Department does not dispute, that they have always had the inherent right to terminate any employee for any legitimate reason. They argue that should the Department's position be accepted, one of two absurd results would follow. First, between the ages of 60 and 65 an employee would be guaranteed employment if he chose not to retire. The other possible interpretation, defendants argue, is that an employee terminated between 60 and 65 would be ineligible for benefits under the plan.

This Court does not find the Department's position tenable in light of *Marshall v. Hawaiian Telephone Co.*, 575 F.2d 763 (9th Cir. 1978). In that case, decided after *McMann*, the Department argued that the employer did not observe the terms of a plan when it retired several employees because of their age. The plan permitted, but did not require, the employer to retire employees at age 60.

The Ninth Circuit stated:

The Secretary contends that the section 4(f)(2) exception for employers acting "to observe the terms of" a plan does not apply unless the plan *requires* retirement at a certain age. According to the Secretary, forced retirements solely at the employer's option, though permitted by the plan, do not qualify for the exception. The Secretary reasons that an employer "observes" the terms of a plan only

where the employer is *forced* by its terms to retire an employee. Where an employer *chooses* to retire an employee, according to the argument, the employer is not passively "observing" the plan.

After careful consideration, we reject the Secretary's position that an employer does not "observe the terms of" a plan by exercising the option permitted by a plan to force retirement on an employee.

. . . . .

We choose to join the *Zinger* [*Zinger v. Blanchette*, 549 F.2d 901 (3d Cir. 1977)] court in reading the language of Section 4(f)(2) as permitting an employer to exercise the option of retiring employees pursuant to a bona fide retirement plan even where the plan does not require such retirements. *Marshall v. Hawaiian Telephone Co., supra* at 766–67 (citations and footnotes omitted, emphasis in original).

This position is in accord with *Zinger v. Blanchette*, 549 F.2d 901 (3d Cir. 1977), *cert. denied*, 434 U.S. 1008, 98 S.Ct. 717, 54 L.Ed.2d 750 (1978). That case, cited favorably by the Supreme Court in *McMann*, pointed out that there is a measurable difference between terminations where substantial benefits are paid and outright discharges. The court noted that:

The primary purpose of the Act is to prevent age discrimination in hiring and discharging workers. There is, however, a clear, measurable difference between outright discharge and retirement, a distinction that cannot be overlooked in analyzing the Act. While discharge without compensation is obviously undesirable, retirement on an adequate pension is generally regarded with favor. *Id.* at 905 (footnotes omitted).

██ There is no question that defendants have had the power, exercised over the years, to involuntarily retire employees. Accordingly, this Court concludes that defendants "observed the terms" of the benefits plan when they involuntarily retired their employees while providing them with their pension benefits.

B. *"Bona Fide Pension Plan"*

 This element may be quickly disposed of. It seems fairly clear that a plan which exists and pays substantial benefits is bona fide. *Brennan v. Taft Broadcasting Co.,* 500 F.2d 212 (5th Cir. 1974). *See United Air Lines, Inc. v. McMann,* 434 U.S. 192, 98 S.Ct. 444, 446, 54 L.Ed.2d 402 (1977). There is no dispute that defendants' plans have existed for over 25 years and have paid substantial benefits to retired employees. This Court concludes that the plans are bona fide.

C. *"Subterfuge"*

In *McMann,* the Supreme Court stated that:

> In ordinary parlance, and in dictionary definitions as well, a subterfuge is a scheme, plan, stratagem or artifice of evasion. In the context of this statute, "subterfuge" must be given its ordinary meaning and we must assume Congress intended it in that sense. So read, a plan established in 1941, if bona fide, as is conceded here, cannot be a subterfuge to evade an Act passed 26 years later. *United Air Lines, Inc. v. McMann,* 434 U.S. at 203, 98 S.Ct. at 450.

 A plan enacted prior to the Act cannot therefore be a subterfuge to evade it. Since the Department concedes, as it must, that both the C & O and B & O pension plans were in existence long before the promulgation of the ADEA, it appears to this Court that the plans cannot be a subterfuge to evade the purposes of the Act.

 The Department's only argument is that the post-Act amendments to the plan modified it in such a way that it became a subterfuge. This position is untenable. With the exception of the reduction in the mandatory retirement age (which will be dealt with *infra*), the amendments to the plan infringed no substantive rights of the employees but liberalized and increased the benefits available under the plan. Thus, it is impossible for this Court to see how these pre-Act pension plans could be considered "subterfuges" under the *McMann* decision.

 Since defendants have satisfied the three elements of Section 4(f)(2), it appears to this Court that their termination of 142 employees was exempted by the provisions of the Act itself. Only two other matters need to be briefly noted in this regard.

The Department has argued that *McMann* and *Zinger* should not be expanded since Congress has enacted amendments to the ADEA. *See* Pub.L. No. 95–256, § 2(a), 92 Stat. 189. The Department cites legislative history of this amendment for the proposition that "the *McMann* decision, insofar as it imputed to Congress an intent to permit involuntary retirement because of age under some plans, was incorrect." Plaintiff's Post Trial Brief on The Issues of "Pension Entitlement" and the "Reduction in the Mandatory Retirement Age," at 23.

This contention is exactly one of the arguments made by the dissent in *McMann.* *See McMann* at 218–19 (Marshall, J., dissenting). The argument was expressly repudiated by Chief Justice Burger for the majority when he stated that "Legislative observations 10 years after passage of the Act are in no sense part of the legislative history." *McMann* at 200 n. 7. Since this argument has already been disposed of by the Supreme Court, this Court need not trouble itself with it.

Finally, both sides spent some time arguing over the availability of a 4(f)(1) defense in this situation. It seems to this Court that it is clear that defendants had an overriding business necessity to reduce their work force. They responded to this business necessity by terminating many employees, some of them based upon the criterion of pension entitlement. Defendants argue that "pension entitlement" was a "differentiation based on reasonable factors other than age" within 4(f)(1), while the Department argues that it is merely a method for terminating older workers.

After careful consideration, this Court believes that the question of whether pension entitlement is a "differentiation based on reasonable factors other than age" cannot be distinguished in this case from the

availability of a 4(f)(2) defense. Surely if Congress intended for 4(f)(1) to cover the instant situation, there would be no need to specifically exempt pension plans from the ADEA pursuant to Section 4(f)(2). The Court concludes that the question of whether the employer's actions were reasonable is governed by the availability of the 4(f)(2) defense. Therefore, although the Court agrees with defendants that (1) they had a clear business necessity to reduce their forces and (2) other methods of reduction (i. e. relative performances etc.) were infeasible, the Court finds that the reasonableness of the use of pension entitlement must be governed by 4(f)(2).

Since defendants did have a definite business necessity to reduce their work force, this Court finds that they could reasonably take advantage of Section 4(f)(2) by retiring workers pursuant to their pension plan.

### V. *Whether the Reduction of the Mandatory Retirement Age Violated Section 4(a)*

■■■ In Section III above, the Court outlined its analysis of the Department's burden in ADEA cases. It seems clear that the Department's showing that defendants amended their pension plans to require employees to retire at age 62 establishes a prima facie case of age discrimination. The important question again is whether defendants qualify for a 4(f)(2) defense.

### VI. *Whether the Reduction of the Retirement Age Was Exempt Under Section 4(f)(2)*

The three elements of a Section 4(f)(2) defense were discussed in Section IV of this opinion. The Court will apply the facts surrounding the amendment to the pension plan to these elements.

It is clear that in retiring their employees mandatorily at age 62 defendants have been "observing the terms" of the plan. Indeed, even the Department concedes that a mandatory provision in a plan satisfies this requirement. This element has been complied with. *United Air Lines, Inc. v. McMann, supra ; Marshall v. Hawaiian Tel-*

*ephone Co., supra.* It is also clear that the plan is "bona fide," since it exists and pays benefits. *Brennan v. Taft Broadcasting Co., supra.* The first two elements have been satisfied.

The only element which creates any room for reasonable argument is the "subterfuge" component. The pension plans were both created more than 25 years ago. However, in 1972, defendants enacted amendments which lowered the mandatory retirement age from 65 to 62. The Department argues that these post-Act amendments were a subterfuge to avoid the Act.

Analytically, the Department's argument is fairly simple. It contends that the purpose and effect of the 1972 amendments was to reduce the defendants' work force at the particular expense of older workers. This purpose, the Department argues, is clearly prohibited by the letter and spirit of the Age Discrimination Act. Therefore, the enactment of the 1972 amendments caused the plan to be used as a "subterfuge to evade the purposes of" the Act.

Although this argument has some appeal, it is without merit. The logical conclusion of the Department's arguments is that any attempt by an employer to avail himself of the requirements of Section 4(f)(2) necessarily renders his plan a "subterfuge." The Court cannot find any justification for such a result from the statute, its legislative history, or the case law construing it. The Court believes that the correct distinction was drawn by the Third Circuit in *Zinger v. Blanchette, supra,* which held that a plan which provided substantial retirement benefits could not be considered a subterfuge.

■■■ Finally, it is clear that defendants have always had the power to involuntarily retire their employees under the consistent application of their plans. It seems to this Court that the mere codification of this power in 1972 could not operate to somehow convert these pre-Act plans into post-Act "subterfuge." The Court concludes that a 4(f)(2) defense is available to the railroad companies.

## VII. The Portal-to-Portal Act

Section 7(e) of the ADEA, 29 U.S.C. § 626(e), incorporates Section 10 of the Portal-to-Portal Act, 29 U.S.C. § 259. Section 10 provides in pertinent part:

[N]o employer shall be subject to any liability or punishment . . . if he pleads and proves that the act or omission complained of was in good faith in conformity with and in reliance on any written administrative regulation, order, ruling, approval, or interpretation, of [an] agency of the United States . . . or any administrative practice or enforcement policy of such agency with respect to the class of employers to which he belonged. Such a defense, if established, shall be a bar to the action or proceeding, notwithstanding that after such act or omission, such administrative regulation, order, ruling, approval, interpretation, practice, or enforcement policy is modified or rescinded or is determined by judicial authority to be invalid or of no legal effect.

Defendants have properly pled Section 10 as a defense to the Department's complaint and have introduced various opinion letters and an interpretive bulletin as the basis for this defense. It is undisputed that the interpretations were issued by the Wage and Hour Division of the Department of Labor and are the proper subject for reliance if relevant. The publications were all concerned with Section 4(f)(2). Relevant portions are excerpted below.

[T]he Act authorized involuntary retirement irrespective of age, provided that such retirement is pursuant to the terms of a retirement or pension plan meeting the requirements of Section 4(f)(2). 29 C.F.R. § 860.110 (First published Aug. 30, 1968).

The lowering of the retirement age from 65 to 62 years for employees participating in a bona fide retirement plan would not affect the applicability of provisions authorizing retirement irrespective of age pursuant to retirement or pension plans, provided such plans are not a subterfuge to evade the purposes of the Act. The

statutory exception would not apply to the involuntary retirement before age 65 of employees who are not participants in a retirement plan. Opinion Letter of Wage-Hour Administrator, September 6, 1968.

[T]he term "bona fide" given its generally understood meaning, describes a plan established in good faith to provide certain fringe benefits for employees, and not as a device or subterfuge to avoid the purposes of the Act. Opinion Letter of Wage-Hour Administrator, June 29, 1971.

These documents, and others, were reviewed by defendants' officers prior to taking the two actions involved in this complaint. The Court will therefore examine these two actions to determine whether defendants acted in good faith and in conformance with the publications.

### A. The 1971 Force Reduction

The Department does not appear to dispute the fact that defendants subjectively relied on its publications, but instead contends that the standard is an objective test and that defendants' actions do not satisfy that test.

This Court, however, has determined that it was lawful and reasonable for defendants to terminate the 142 employees since they were entitled to the 4(f)(2) exemption from the Act. Accordingly, it would seem apparent that defendants could rely on interpretations which appear to support their position. Indeed, the Third Circuit adopted a position quite similar to defendants in Zinger v. Blanchette, supra, when it interpreted Section 860.110. The Court concludes that defendants could and did reasonably rely on these publications and therefore have presented a meritorious defense under Section 10 of the Portal-to-Portal Act.

### B. The 1972 Amendments

Defendants' position is even stronger in regard to the 1972 amendments. The September 6, 1968 opinion letter specifically sanctioned lowering the mandatory retire-

ment age in a benefit plan from 65 to 62. This is exactly what defendants did. Moreover, the Court cannot accept the Department's argument that the filing of suit by the Department removed defendants' rights to rely on this document. Section 10 provides that an interpretation is no longer a proper subject for reliance if (1) it is rescinded or modified, or (2) it is determined by judicial authority to be of no effect. This opinion letter has never been withdrawn by the Department, despite its present arguments. Moreover, this Court believes that the Department's former position, rather than its present position in this litigation, was the correct one. Consequently, the Court finds that defendants have pled and proven a valid defense under Section 10.

## VIII. *Conclusion*

For the reasons stated in this opinion, the Court finds:

(1) that the Department did not satisfy the conciliation requirement of the Act. This failure, however, was cured by the subsequent conciliation achieved after a stay issued by this Court;

(2) the scope of the Department's complaint includes individuals terminated because of defendants' 1972 amendments, but all other individuals must show a sufficient nexus to pre-complaint violations;

(3) the Department met its burden of proving a violation of Section 4(a) in regard to the 1971 force reduction;

(4) defendants' actions in terminating 142 individuals in the 1971 force reduction are exempted from the Act by virtue of Section 4(f)(2);

(5) the Department met its burden of proving a violation of Section 4(a) in regard to the 1972 amendments to the plan;

(6) the 1972 amendments are exempted from the Act by virtue of Section 4(f)(2); and

1. The divided opinions of several United States Courts of Appeals had motivated the Court to grant certiorari on this issue. 434 U.S. at 193, 98 S.Ct. 444; *see Zinger v. Blanchette*, 549 F.2d 901 (3d Cir. 1977), *cert. denied*, 434 U.S. 1008,

(7) defendants have pled and proven exemption from liability pursuant to Section 10 of the Portal-to-Portal Act.

## ON MOTION FOR PARTIAL RECONSIDERATION

This action was filed on behalf of the Secretary of Labor on June 19, 1974. In the complaint, the Department of Labor [hereinafter Department] charged the Baltimore and Ohio Railroad Company [B & O] and the Chesapeake and Ohio Railway Company [C & O] with violating section 4 of the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq.* (1976) [hereinafter the Act or ADEA]. Trial was held on six separate issues on April 27, 28 and May 17–25, 1978. Counsel for both plaintiff and defendants submitted exhaustive pretrial and post-trial memoranda. At trial and through these memoranda, the parties litigated, among other issues, the question of whether the actions of the defendants in terminating 142 individuals in their 1971 force reduction are exempted from the Act by virtue of section 4(f)(2), 29 U.S.C. § 623(f)(2) (1976).

On September 6, 1978, this Court issued an opinion in which it found that the termination of the 142 individuals pursuant to a bona fide employee benefits plan enacted prior to 1967 is exempt under section 4(f)(2) of the Act. In resolving this issue, the Court relied upon the Supreme Court's interpretation of section 4(f)(2) in *United Air Lines, Inc. v. McMann*, 434 U.S. 192, 98 S.Ct. 444, 54 L.Ed.2d 402 (1977).[1] In *McMann*, the Supreme Court examined the statutory language and legislative history of section 4(f)(2) and found nothing to indicate that Congress intended to invalidate retirement plans instituted in good faith prior to the enactment of the Age Discrimination in Employment Act of 1967. *Id.* at 203, 98 S.Ct. 444. Therefore, the Supreme

98 S.Ct. 717, 54 L.Ed.2d 750 (1978); *McMann v. United Air Lines, Inc.*, 542 F.2d 217 (4th Cir. 1976); *Brennan v. Taft Broadcasting Co.*, 500 F.2d 212 (5th Cir. 1974).

Court concluded that section 4(f)(2) "[was] intended to permit observance of the mandatory retirement terms of bona fide retirement plans, but that the existence of such plans could not be used as an excuse not to hire any person because of age." *Id.* at 202, 98 S.Ct. at 449. That statutory interpretation served as support for this Court's determination, in this case, that the defendants' 1971 force reduction satisfied the requirements of section 4(f)(2) and thereby avoided violation of other provisions of the Act.

When the Supreme Court decided the *McMann* case in December 1977, it was cognizant of the fact that Congress had several amendments to the ADEA before it. One of these amendments was to "clarify" the meaning of section 4(f)(2) to preclude the exemption of the mandatory retirement of employees pursuant to bona fide retirement plans from the Act's requirements. Although this pending amendment presented a contrary interpretation of section 4(f)(2), the Supreme Court found that it had to limit its review to the statutory language and legislative history of the 1967 Act and could not consider "[l]egislative observations [made] 10 years after passage of the Act . . ." *Id.* at 200 n.7, 98 S.Ct. at 449.

On April 6, 1978, several months after release of the *McMann* decision and several weeks prior to trial in this case, Congress enacted the amendment to section 4(f)(2), Pub.L. No. 95–256, 92 Stat. 189 (1978), to clarify that:

> [t]he purpose of this exception was to facilitate the hiring of older employees by permitting their employment without necessarily providing equal benefits under employee benefits plans.

S. Rep. No. 493, 95th Cong., 2d Sess. 9, *reprinted in* [1978] U.S.Code Cong. & Ad. News pp. 976, 984. The House Conference Report on the amendment addressed the *McMann* decision and stated that the conferees specifically disagreed with the holding and reasoning in that case. H.R. Conf. Rep. No. 950, 95th Cong., 2d Sess. 8, *reprinted in* [1978] U.S.Code Cong. & Ad.News pp. 1000, 1001.

The Department has moved this Court to partially reconsider its September 6, 1978 opinion in light of this amendment. The Secretary argues that the amendment merely clarifies the original purpose of section 4(f)(2) as enacted in 1967 and that, since the amendment became law prior to trial in this case, the Court must apply the new interpretation of section 4(f)(2) to the defendants' termination of 142 individuals. Under the 1978 amendment's interpretation of section 4(f)(2), the Secretary correctly contends that the defendants' actions in terminating 142 employees in their 1971 force reduction are not exempted from the requirements of the Act. For the Court to reach that conclusion, however, the Secretary must show that the amendment should apply retroactively to the defendants' conduct.

To support its argument that the 1978 amendment should govern this action, the Department cites the general principle set forth in *Bradley v. School Board,* 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974):

> a court is to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary.

*Id.* at 711, 94 S.Ct. at 2016. The Department contends that the legislative history of the amendment clearly establishes a Congressional intent to clarify, rather than alter, the meaning of section 4(f)(2) as enacted in 1967 and to apply the clarified interpretation of the section retroactively to actions that arose prior to April 6, 1978. The Secretary also argues strenuously that no manifest injustice would occur through retroactive application since age discrimination is an issue of "great national concern" that the defendants did not have a right to engage in. Furthermore, the Secretary asserts that the defendants should have been aware of the possibility that their interpretation of section 4(f)(2) would not become the settled law. Therefore, the Secretary concludes, the 1978 amendment to section 4(f)(2) should be applied to this action to

invalidate the defendants' mandatory retirement of 142 individuals in 1971.

In response, the defendants point out that the Secretary, at trial, raised the same interpretation of section 4(f)(2) as he does now but without submitting the 1978 amendment as support for his position. In its September 6, 1978 opinion, the Court rejected that interpretation and found that the companies specifically considered, relied on, and acted in conformity with section 4(f)(2) and the Department of Labor's official interpretation thereof. The defendants believe that the Court's prior ruling on section 4(f)(2) is sufficient grounds for denial of this motion. However, if the applicability of the 1978 amendment must be considered, the defendants contend that Congress must make its intent clear when it retroactively affects substantive rights.

Here, defendants argue, Congress intended the new legislation concerning section 4(f)(2) to have prospective effect only. This intent, they assert, comports with the settled rule that legislation affecting substantive rights is presumed to operate prospectively only. Under a contrary rule, they maintain, "private parties would literally be unable to comply with the law." See Defendants' Opposition to Plaintiff's Motion for Partial Reconsideration at 9 filed November 1, 1978. They conclude that such a state of affairs would lead not only to manifest injustice for a party that reasonably relied on prior settled law, but also to a violation of that party's right to due process. Based on this reasoning, the defendants request the Court to stand on its September 6, 1978 ruling.

This Court approaches the Plaintiff's Motion for Partial Reconsideration with great concern. The intent that the Secretary of Labor attempts to ascribe to Congress in its enactment of the 1978 amendment to section 4(f)(2) has serious implications for the ability of private parties to conduct their activities in accordance with law. This Court refuses to accept the legislative intent asserted by the Secretary of Labor without a showing that Congress carefully considered the impact of the change in the law on the prior conduct of private individuals and businesses and clearly stated its intent to rearrange previous economic relationships.

The language of § 4(f)(2), as enacted in 1967, was susceptible of two interpretations. See United Air Lines, Inc. v. McMann, supra, 434 U.S. at 209, 98 S.Ct. 444 (Marshall, J., dissenting). The then Wage and Hour Administrator of the Department of Labor issued an interpretive bulletin in 1968 setting forth his opinion that section 4(f)(2) should be read to exclude mandatory retirements pursuant to bona fide employee benefit or retirement plans enacted prior to 1967. See 29 C.F.R. § 860.110 (first published Aug. 30, 1968); Marshall v. B & O and C & O, Opinion, Sept. 6, 1978 at 7–8314–2 – 8315–1. The defendants, faced with economic hardship and the need to reorganize their business operations in the early 1970's, considered and relied upon the Secretary's interpretive bulletin as well as the Act itself, in choosing to require the early retirement of 142 employees in 1971 in accordance with the terms of their employee benefits plan. Thereafter, several United States Courts of Appeals addressed the issue of the proper interpretation of section 4(f)(2) and reached divergent conclusions. See Zinger v. Blanchette, supra; Brennan v. Taft Broadcasting Co., supra. Because of that conflict, the Supreme Court heard United Air Lines, Inc. v. McMann, supra, and determined, from reading the language and legislative history of section 4(f)(2), that mandatory retirements pursuant to bona fide benefit or retirement plans fall under the exemption and therefore do not violate other sections of the ADEA. This reading concurred with the defendants' interpretation of section 4(f)(2) in 1971 and served as the foundation for this Court's opinion in September 1978 that B & O and C & O did not violate the ADEA by retiring 142 employees during their force reduction.

The amendment, which the plaintiff wishes the Court to apply in this case, first surfaced in Congress after the Courts of Appeals split in their interpretation of section 4(f)(2) and just prior to the Supreme

Court's decision in *McMann*. Congress enacted the amendment as part of a package of amendments to the ADEA on April 6, 1978. This Court finds it difficult to believe that Congress would apply that amendment retroactively to activity undertaken prior to 1978 without a careful consideration of the extensive litigation over the meaning of section 4(f)(2) and the justifiable reliance of many private businesses on what appears to have been the dominant interpretation of that section until the 1978 amendment clarified congressional intent. For that reason, the Court will scrutinize the legislative history of the 1978 amendments carefully to determine whether the retroactive intent asserted by the Secretary of Labor is clear and unambiguous.

The legislative history of the 1978 amendments to the ADEA states that the original purpose of section 4(f)(2) was to ease the difficulty of hiring older employees by relaxing the necessity for equal benefits for these workers under employee benefit plans. *See* S. Rep. No. 493, *supra.* The Joint Explanatory Statement of the Committee of Conference, in declaring that § 4(f)(2) prohibits the mandatory retirement of an employee within the protected age group pursuant to a bona fide employee benefits plan, makes clear that the interpretation of section 4(f)(2) adopted by the former Wage and Hour Administrator in his interpretive bulletin, the defendants in their 1971 force reduction, the Supreme Court in *McMann,* and this Court in the September 6, 1978 opinion no longer controls the question of mandatory retirement.

Instead, the Joint Explanatory Statement announces that:

> The conferees specifically disagree with the Supreme Court's holding and reasoning in [*McMann*]. Plan provisions in effect prior to the date of enactment are not exempt under Section 4(f)(2) by virtue of the fact that they antedate the act or these amendments.

H.R. Conf. Rep. 950, *supra* at 8, U.S.Code Cong. & Ad.News at 1001.

While these legislative observations clearly set forth the congressional intent to clarify the original meaning of section 4(f)(2), they do not touch upon the issue of whether the clarified intent should be applied retroactively. The plaintiff appears to rely on the clarifying purpose of § 4(f)(2) as the foundation for his argument that Congress intended the amendment to have retroactive effect. *See Plaintiff's Memorandum of Law in Support of Motion for Partial Reconsideration,* pages 8 and 9, filed October 13, 1978.[2] The Secretary does not present any legislative statements that refer to the retroactive effect of the amendment. The defendants, however, have brought to the Court's attention several legislative observations that do address that issue. *See 123,* Cong.Rec. S17304 (daily ed. Oct. 19, 1977); 124 Cong.Rec. S4449 (daily ed. March 23, 1978). In inspecting this aspect of the legislative history, the Court is convinced that Congress intended the 1978 amendment to section 4(f)(2) to have prospective effect only.

In a colloquy with Senator Williams, the floor and conference manager for the 1978 amendments to the ADEA, Senator Randolph specifically asked whether the amend-

2. The plaintiff also cites *Davis v. Boy Scouts of America,* 457 F.Supp. 665 (D.N.J.1978), as support for his position. In *Davis,* the court held that the 1978 amendment applied to a pre-existing controversy. The district judge found that Congress in passing the amendment meant to reverse decisions interpreting the ADEA, so as to allow involuntary or mandatory retirement on the basis of a "bona fide" pension plan. *Id.* at 673. Although he initially felt that the plaintiff sought a retroactive application of the amendment, the district judge concluded the the plaintiff actually was requesting the court to apply the law which is currently in effect at the time of the decision. *Id.* Relying heavily on the congressional intent to clarify the law, the court found that the amendment controlled the disposition of the case under *Bradley v. School Board, supra. Id.* at 673.

This Court does not find *Davis* dispositive of the issue in this case. The *Davis* court does not address directly the timing issue but, as does the plaintiff in this case, infers from the congressional intent to clarify the law that the legislature meant the amendment to have both a prospective and retrospective effect. Without an adequate discussion of the legislative history of the 1978 amendments to the ADEA on this point, the Court does not find that inference to be persuasive support for the conclusion that the *Bradley* principle should be applied in this case.

ed Act would have a retroactive effect on mandatory retirements previously exempted by § 4(f)(2):

> I should like to ask the Senator from New Jersey (Mr. Williams) whether this bill retroactively covers a forced retirement at say age 60 or 62 prior to the effective date of this bill where the individual so retired is eligible for, and actually receives, a pension under a pension plan which has been qualified with the Internal Revenue Service.
>
> [Senator Williams responded:]
>
> The bill is not retroactive. The question of mandatory retirements prior to the effective date of this bill will be determined by the courts' interpretation of existing law.

123 Cong.Rec. S17304 (daily ed. Oct. 19, 1977).

Beyond this specific reference to retroactivity, the entire legislative history evinces an entirely different motivation behind the enactment of the 1978 amendments than that pressed upon this Court by the Secretary of Labor. Rather than mere clarification of original purpose, the drafters and managers of the 1978 legislation intended it to reflect the "more comprehensive understanding about the desires and abilities of older persons" gained by social scientists and legislators since the enactment of the ADEA in 1967. 124 Cong.Rec. S4449 (daily ed. March 23, 1978). Consistent with that

overall purpose, the amendments were drafted to "insure that the act (ADEA) provides a full measure of meaningful protections for older workers." *Id.* As one of those measures, the mandatory retirement age was raised from age 65 to 70. The amendment to section 4(f)(2), while intended to clarify the original purpose of the section, was also passed to insure that other parts of the 1978 amendments, such as the increase in the mandatory retirement age, would retain their full force under the amended Act. The interrelationship between section 4(f)(2) and other amended sections is clearly set forth by Senator Williams:

> The conference agreement also clarifies the existing law to insure that pension plans or seniority systems which require mandatory retirement may no longer be applied to employees covered by the Act. . . . [r]aising the act's upper age limit would be meaningless if the Court's interpretation of § 4(f)(2) was allowed to stand. The conference agreement assures that this loophole in the present law will be closed.

*Id.* The Court interprets this statement to suggest strongly that section 4(f)(2) should not be severed from other amended sections and that Congress intended the entire legislative package represented by the 1978 amendments to the ADEA to have prospective effect only.[3]

---

**3.** The defendants have stressed the "may no longer be applied" language in Senator Williams' remarks as support for their position that Congress intended the amendment to apply prospectively. The Court agrees with the defendants and finds that that reference, when combined with the prior statement of Senator Williams on the question of retroactivity, presents a consistent indication of the intent of the floor and conference manager of the legislation to have the amendment apply to future acts only.

The Court also observes that other statements in the legislative history provide further support for a finding of a prospective effect. In a discussion with Senator Javits, Senator Percy expressed his grave reluctance in voting for the amendments:

> . . . I have never voted on a bill which I have more reservations and questions about than this bill . . . I have serious reservations, because I wonder whether we really

know all of the ramifications of what we are doing today.

123 Cong.Rec. S17304 (daily ed. Oct. 19, 1977). Senator Javits replied that supporters of the bill had taken certain precautions, such as the deferral of the effective date of some sections of the bill, in response to those questions. *Id.* During the same meeting, Senator Williams, in answering Senator Randolph's inquiry, stated, in substance, that the amendment to section 4(f)(2) would not be applied retroactively. *Id.* In viewing Senator Percy's questions, Senator Javits' assurances, and Senator Williams' statement together, as they occurred during the same meeting, this Court infers from the legislative history that the retroactivity issue was specifically considered by the conference committee and that the decision to apply the amendment prospectively evolved, in part, from the conferees' emphasis on the need for precautionary measures.

The Court's reading of the legislative history of the 1978 amendments is consistent with the general rules of statutory interpretation. Amendatory statutes, especially those that reflect a change in knowledge or societal attitudes, should operate prospectively only. *See Hospital Employees Labor Program v. Ridgeway Hospital,* 570 F.2d 167, 169–70 (7th Cir. 1978). Unlike other statutes that courts have construed to apply to pre-existing events or actions, *see Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976) (Coal Mine Health and Safety Act of 1969); *Gates v. Collier,* 559 F.2d 241 (5th Cir. 1977) (Civil Rights Attorney's Fees Awards Act); *White v. Estelle,* 556 F.2d 1366 (5th Cir. 1977) (Federal Magistrates Act), the 1978 amendments are not accompanied by a strong indication of legislative intent to apply them retroactively. *See Greene v. United States,* 376 U.S. 149, 84 S.Ct. 615, 11 L.Ed.2d 576 (1964); *Hospital Employees Labor Program v. Ridgeway Hospital, supra; NLRB v. St. Luke's Hospital Center,* 551 F.2d 476 (2d Cir. 1976); *Weise v. Syracuse University,* 522 F.2d 397 (2d Cir. 1975). Therefore, the Court concludes, on the basis of legislative history and general interpretive rules, that the 1978 amendments to the ADEA, including the amended section 4(f)(2), were intended by Congress to operate prospectively to provide statutory protection for older workers that reflects society's more comprehensive understanding, in the year 1978, of the desires and abilities of those workers.

Even if Congress did not clearly express an intent to apply the amended section 4(f)(2) prospectively, this Court would find that the facts and circumstances present in this case require that the 1978 amendment not be applied to the defendants' termination of 142 employees during their 1971 force reduction. The Court recognizes the general principle established in *Bradley v. School Board, supra,* that existing law must control a decision, but concludes that manifest injustice would result if that rule were followed in this case.

In *Bradley,* the Supreme Court stated that the court must look to three factors in determining whether current law may be justifiably applied to pre-existing controversies. Those factors are: (1) the nature and identity of the parties; (2) the nature of their rights; and (3) the nature of the impact of the change in the law upon those rights. *Bradley, supra* at 717.

Under the first prong of the *Bradley* test, the Court must judge whether the present controversy more closely resembles a "mere private [case] between individuals," *id.* 416 U.S. at 718, 94 S.Ct. 2006, or an issue of "great national concern." *Id.* at 718–19, 94 S.Ct. 2006; *see United States v. Schooner Peggy,* 5 U.S. (1 Cranch) 103, 110, 2 L.Ed. 103 (1801). The Court agrees with the plaintiff that age discrimination is an issue of great national concern but feels that there is an additional issue of equal importance in this case—the ability of private individuals and businesses to justifiably rely on current, reasonable interpretations of existing law in arranging their activities and relationships. This private interest is a cornerstone of a just and orderly society that should be given no less weight then the need to eradicate age discrimination in employment. In judging the nature and interests of the parties, then, it is clear that the present case contains ingredients of both public and private concern. This mixture of interests distinguishes this case from cases such as *Bradley, supra,* and *United States v. Hinds County School Board,* 560 F.2d 619 (5th Cir. 1977), which involved the issue of school desegregation and little, if any, justifiable reliance on the part of the public officials named as defendants.

Under the second factor in weighing manifest injustice, the Court must determine whether the application of current law will unreasonably infringe upon a "right that had matured or become unconditional." *Bradley, supra,* 416 U.S. at 720, 94 S.Ct. at 2020; *see Greene v. United States, supra.* The plaintiff contends that, under tradition-

al case law, *see, e. g., Greene v. United States, supra; Claridge Apartments Co. v. Commissioner,* 323 U.S. 141, 65 S.Ct. 172, 89 L.Ed. 139 (1944); *Union Pacific R.R. v. Laramie Stock Yards Co.,* 231 U.S. 190, 34 S.Ct. 101, 58 L.Ed. 179 (1913), the scope of those rights that are mature or unconditional is narrow. The plaintiff also asserts that the defendants' right to engage in age discrimination certainly would not fall within those boundaries. *See* Plaintiff's Memorandum at 12. Therefore, the plaintiff would have the Court conclude that the retroactive withdrawal of the defendants' right to engage in age discrimination pursuant to the terms of their pension plan would not work a manifest injustice.

The Court disagrees with the plaintiff's reading of the scope of those rights which are mature or unconditional and the Secretary's characterization of the defendants' right affected by the application of the 1978 amendment as solely the right to engage in age discrimination. The Court believes that the nature of the parties' rights must be treated with some flexibility, consistent with the complexities of economic life, and considered closely with the third factor in *Bradley*—the impact of the change in the law on those rights.

In *Bradley* and many of the cases that have applied laws retroactively under the *Bradley* test, *see, e. g., King v. Greenblatt,* 560 F.2d 1024 (1st Cir. 1977) (Civil Rights Attorney's Fees Awards Act); *United States v. Hinds County School Board, supra* (Equal Educational Opportunity Act of 1974); *Gates v. Collier, supra* (Civil Rights Attorney's Fees Awards Act); *White v. Estelle, supra* (Federal Magistrates Act), courts have characterized defendants' rights in terms of whether they could expect that they had a right to engage in the now proscribed activity, *United States v. Hinds County School Board, supra* at 622, or whether they would have "ordered their conduct differently if they had known the new statute was going to apply" to that activity. *King v. Greenblatt, supra* at 1025–26 n.2; *see Bradley, supra,* 416 U.S. at 720–21, 94 S.Ct. 2006. In this case, the B &

O and C & O, as private enterprises, are in a much different situation with respect to the nature of their rights affected by the change in the law than the public defendants in the above cited cases. Although they may not have had a right to engage in age discrimination, the B & O and C & O did have a right to engage in commerce and to take those actions necessary to achieve economic stability that were not violative of the law. Furthermore, the defendants relied upon and conformed with the former Wage and Hour Administrator's interpretive bulletin on the meaning of section 4(f)(2) in choosing to terminate 142 individuals pursuant to the retirement terms of their pension plan. It is obvious that the B & O and C & O would not have followed this course of action as part of a major economic reorganization if they knew or could reasonably expect that the present interpretation of section 4(f)(2) would be applied to their activity.

Therefore, this Court finds that the defendants, as private enterprises entering into a major economic decision, had a right to rely upon the Secretary of Labor's interpretation of section 4(f)(2). Moreover, the impact of the 1978 amendment upon that right would be severe and unjustifiable. To apply the amendment, under these circumstances, would work a manifest injustice on the right of these defendants, as private entities, to go forward with a course of action which they validly believed was in conformance with the best interpretation of the law at that time. As a result, this Court alternatively holds that, even if Congress did not intend the 1978 amendment to apply prospectively, the amended section 4(f)(2) cannot be applied in this case since it would work a manifest injustice on the rights of the defendants. *See Bradley v. School Board, supra; Arkoosh v. Dean Witter & Co.,* 571 F.2d 437 (8th Cir. 1978).

In accordance with the aforegoing opinion, IT IS hereby ORDERED this 5th day of December, 1978 that:

384

(1) the plaintiff's Motion for Partial Reconsideration of this Court's September 6, 1978 opinion in light of the 1978 amendment to section 4(f)(2) of the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq.* (1976) BE, and the same hereby IS, DENIED.