William C. SEXTON, Plaintiff-Appellant,

v.

BEATRICE FOODS CO.,
Defendant-Appellee.

No. 79–1661.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 6, 1979.

Decided Aug. 7, 1980.

Rehearing and Rehearing En Banc
Denied Oct. 31, 1980.

James S. Whitehead, Chicago, Ill., for plaintiff-appellant.

Columbus R. Gangemi, Jr., Winston & Strawn, Chicago, Ill., for defendant-appellee.

Karen MacRae Smith, Washington, D. C., for amicus curiae, Equal Employment Opportunity Commission.

Before SWYGERT, BAUER and CUDAHY, Circuit Judges.

CUDAHY, Circuit Judge.

This is an appeal by plaintiff William C. Sexton from a judgment granting the motion of defendant Beatrice Foods Company ("Beatrice") for partial summary judgment

and dismissing his claim that the termination of his employment by Beatrice violated the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 et seq. (1976 & Supp. II 1978). In early 1977, Beatrice terminated Sexton, who was then 59 years old. The normal retirement age under Beatrice's retirement plan is 65 and the plan does not expressly provide that Beatrice may involuntarily retire an employee before he reaches 65. However, the plan does provide that an employee will receive benefits if he elects early retirement after he is 55 years old. Upon his discharge Sexton was offered the benefits of Beatrice's retirement plan.

Beatrice moved for summary judgment on one count of the complaint on the ground that the termination of Sexton was exempted from the general prohibition against age discrimination by reason of 29 U.S.C. § 623(f)(2) (1976).[1] This subsection provides that:

It shall not be unlawful for an employer . . . to observe the terms of a bona fide seniority system or any bona fide employee benefit plan such as a retirement, pension, or insurance plan, which is not a subterfuge to evade the purposes of [the ADEA], except that no such employee benefit plan shall excuse the failure to hire any individual . . .

The district court found that in terminating Sexton, Beatrice had "observe[d] the terms" of a bona fide employee benefit plan and that the plan was not a "subterfuge," so it granted Beatrice's motion. The question presented by this appeal is whether Beatrice observed the terms of its pension plan within the meaning of § 4(f)(2) when it discharged Sexton. Since we conclude that it did not, we reverse the order granting summary judgment and remand for further proceedings consistent with this opinion.

## Facts

We shall here state the basic facts and inferences drawn from them in a way most favorable to Sexton, as we must in considering this motion for summary judgment. Adickes v. S. H. Kress & Co., 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

Sexton was born on September 23, 1917. With the exception of military service, he worked continuously for the John Sexton Company, which had been founded by his grandfather, since 1934. In 1968 the John Sexton Company was acquired by, and became a division of, Beatrice. Thus, at the time of his discharge in January 1977, Sexton was a Beatrice employee. From October 1975 to the date of his discharge, Sexton was vice president of marketing of the Sexton Division.

On January 24, 1977, T. M. Sexton, president of the Sexton Division and William Sexton's cousin, called William Sexton into his office and discharged him, indicating that more aggressive "younger blood" was required for management. Sexton was then 59½ years old. Sexton's position as vice president of marketing was thereafter occupied by a 41-year-old employee.

At no time either before or after his last day of employment on February 16, 1977, was Sexton told that his discharge was related to, or resulted from the provisions of the Beatrice Retirement Income Plan ("BRIP"), Beatrice's pension plan. Upon his discharge Sexton was promised severance pay equal to one year's salary, conditioned solely upon his not going to work for a competing company. Subsequent to his discharge Sexton was informed of Beatrice's official position as to the reasons for his discharge in a letter from Beatrice's attorney:

Please be further advised that Mr. William Sexton's employment with the Com-

---

1. The Age Discrimination in Employment Act Amendments of 1978, Pub.L.No.95–256, 92 Stat. 189, raised the age limit from 65 to 70 and amended § 4(f)(2) to read as follows:

no such seniority system or employee benefit plan shall require or permit the involuntary retirement of any individual specified by section 631(a) of this title because of the age of such individual . . . . 29 U.S.C. 623(f)(2) (Supp.II 1978).

Sexton has not argued that this amendment should be applied retroactively.

pany was terminated by reason of his failure to cooperate fully with top management regarding the implementation of the Company's marketing policies and his failure to devote a substantial portion of normal working time to the affairs of the Company.

At the time of his termination Sexton was earning a salary of $53,000 per year and was eligible for a substantial yearly bonus. He alleged that the discharge deprived him of his peak earnings years at Beatrice since he had intended to work until well into his 60's. Sexton alleged that, under BRIP, retirement benefits are determined on the basis of the five consecutive highest-paid calendar years of the last fifteen years before retirement. Consequently, although Sexton, having completed ten years of continuous service and being more than 55 years old, was eligible to begin drawing benefits under BRIP at his option following his termination, the discharge prevented him from substantially increasing his ultimate pension benefits by depriving him of what would have been his five highest paid years.

Under BRIP the "Normal Retirement Date" is prescribed to be the first day of the month coincident with or next following a participant's 65th birthday. A participant who, on his 65th birthday, has, in the aggregate, five or more years of continuous service is entitled to receive a monthly "Normal Retirement Pension." BRIP also provides that a participant who has attained the age of 55 may elect early retirement and receive an "Early Retirement Pension," provided that he has in the aggregate 10 or more years of continuous service. If payment of the Early Retirement Pension commences prior to the participant's 65th birthday, the amount of the Early Retirement Pension is to be actuarially reduced for early payment. BRIP contains no express provision for involuntary retirement at Beatrice's option because of an employee's age before he reaches age 65, the normal retirement age.

On September 22, 1977, after giving the Secretary of Labor notice of his intent to sue and waiting the required deferral period, Sexton brought suit against Beatrice claiming that the cause of his discharge was his age and that his discharge violated § 4(a)(1) of the ADEA, 29 U.S.C. § 623(a)(1) (1976). Beatrice answered, denying the substance of Sexton's allegations. Sexton subsequently filed his first and second amended complaints, further alleging that Beatrice's refusal to make promised severance payments constituted unlawful retaliation, in violation of § 4(d) of the ADEA, 29 U.S.C. § 623(d) (1976).

On February 6, 1978, Beatrice raised for the first time the affirmative defense that, "Plaintiff's employment was terminated pursuant to a bona fide retirement plan as expressly permitted by § 623(f)(2) [sic] of the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 623(f)(2)." On April 19, 1978, Beatrice moved for partial summary judgment with respect to Count I of Sexton's second amended complaint, which alleged his wrongful discharge, claiming that, "Plaintiff was retired pursuant to bona fide retirement plan," and, consequently, that its action in discharging Sexton fell within the exception contained in § 4(f)(2) of the ADEA.

On May 16, 1979, the district court issued its memorandum opinion granting Beatrice's motion for partial summary judgment. The court noted that, for purposes of its motion, *Beatrice conceded that Sexton had been discharged because of his age.*[2] Nonetheless, the district court concluded that Beatrice could rely on the § 4(f)(2) exception because, having completed more than ten years of continuous service and being more than 55 years of age, Sexton was eligible to receive benefits under BRIP following his discharge. Although the district court agreed with Sexton that BRIP contained no terms expressly providing for involuntary termination of Beatrice em-

**2.** It is fundamental that in considering the issues on this appeal, we must assume that Sex-

ton was terminated because of his age.

ployees because of age prior to age 65 (the "normal" retirement age), the district court held that such terms were not necessary in order to qualify for the exception. Thus the district court concluded that, when Beatrice terminated Sexton and made available to him benefits under the terms of BRIP, Beatrice was "observ[ing] the terms" of the plan.

### Discussion

The question presented by this appeal is whether, in terminating Sexton, Beatrice "observe[d] the terms" of BRIP so as to entitle it to the protection of § 4(f)(2) of the ADEA. To resolve this question we must first determine whether an employer which has forced an employee to retire because of his age before the normal retirement age may avail itself of the § 4(f)(2) defense even though its retirement benefit plan does not provide that the employer has the right to retire an employee before the normal retirement age. Since we conclude that § 4(f)(2) is not available to an employer under these circumstances, we must also make certain whether in the instant case the provisions of BRIP give Beatrice the right to force employees to retire prior to the normal retirement age of 65. These questions will be discussed separately below.

1. *Availability of the § 4(f)(2) Defense.*
■ A number of cases have dealt with the question whether a retirement plan was bona fide or a subterfuge to evade the purposes of the ADEA in the context of § 4(f)(2). Comparatively few cases have dealt with the question whether an employer "observe[s] the terms" of a plan within the meaning of § 4(f)(2) when it retires an employee prior to the normal retirement age even though the pension plan does not authorize it to do so. However, the cases dealing with whether a plan is bona fide or a subterfuge are relevant because they consistently stress the importance of examining the terms of the plan to determine whether the § 4(f)(2) exemption is available. We will therefore examine the relevant cases, as well as the administrative regulations and the legislative history of the ADEA.

In *United Airlines, Inc. v. McMann*, 434 U.S. 192, 98 S.Ct. 444, 54 L.Ed.2d 402 (1977), the retirement benefit plan provided that the "normal retirement age" was 60 and the company's practice was to have each employee retire when he reached that age. Primarily, the *McMann* opinion addressed the question whether the plan was a "subterfuge" to evade the purposes of the Act, but McMann's first argument was that United had failed to "observe the terms" of its plan when he was terminated because of his age. Essentially McMann argued that the term "normal retirement age" did not signify mandatory or compelled retirement at age 60 and that, consequently, United had not retired him to "observe the terms" of the plan.

The Supreme Court accepted the Fourth Circuit's view that the plan should be regarded as one requiring retirement at 60 rather than as a plan which gave the employer the choice of forcing retirement at age 60. This view was based on the employer's consistent practice of requiring retirement at age 60. On the basis of this finding concerning the appropriate interpretation of the terms of United's plan, the Supreme Court rejected McMann's claim that United had failed to "observe the terms" of the plan when he was terminated. 434 U.S. at 196–97, 98 S.Ct. at 447. It is important to note that such an analysis would have been wholly unnecessary if the plan were not required to make express provision for involuntary retirement before age 65.

Beatrice argues on appeal that if it pays "substantial" pension benefits after firing an individual because of his age, the employer may avail itself of the § 4(f)(2) defense because it has "observe[d] the terms" of the plan by paying benefits. However, if the payment of benefits pursuant to a plan, coupled with the common law right to fire an employee for any reason, were enough to avail it of the § 4(f)(2) exception, the Supreme Court in *McMann* need not have

engaged in any analysis of McMann's argument that United had failed to "observe the terms" of its plan. The Supreme Court rejected McMann's contention that United had failed to "observe the terms" of its plan not because such terms were superfluous and unnecessary as long as benefits were paid, as Beatrice would have it, but because the specific terms of the United plan were found to provide for age-based terminations before age 65. The Court's extended analysis of the meaning of the terms of United's plan was unnecessary if Beatrice's present interpretation of the § 4(f)(2) exception were correct. Quite consistently with the detailed scrutiny with which the Supreme Court examined the "observe the terms" provision in the McMann case, no case has been brought to our attention where an isolated firing not pursuant to the express provisions of a plan has been held to enjoy § 4(f)(2) protection.

The Supreme Court in McMann also considered whether the plan was a subterfuge to evade the ADEA because it required employees to retire before age 65. After reviewing the legislative history of the ADEA the Court held that a retirement plan adopted *before* the ADEA was enacted could not be considered a subterfuge to evade the ADEA even though the plan in question expressly provided that the employer could retire a participant because of his age at age 60. The Court concluded that the employer's actions met the requirements of § 4(f)(2), so the employer was not liable for retiring a 60-year-old worker because of his age. 434 U.S. at 203–04, 98 S.Ct. at 450.

Both the majority and dissenting opinions in McMann make sense only on the premise that the § 4(f)(2) exception is applicable only where the scope of involuntary termination is expressly provided for in an employer's retirement plan. Thus, the majority concluded:

> Giving meaning to each of these provisions [of § 4(f)(2)] leads inescapably to the conclusion they were intended to permit *observance of the mandatory retirement terms* of bona fide retirement plans,

but that the existence of such plans could not be used as an excuse not to hire any person because of age. 434 U.S. at 201–02, 98 S.Ct. at 449–450. [Emphasis supplied].

The Justices who dissented in *McMann* argued that in enacting § 4(f)(2) Congress had intended only to permit employers to distinguish between young and old workers by establishing employee benefit plans which would not pay the same benefits to, for example, a worker hired at 55 as they would pay to a worker hired at 25. 434 U.S. at 208–19, 98 S.Ct. at 452–58. The dissenting Justices, however, agreed that if Congress had intended to permit age-based discharges under pension plans, Congress clearly intended that such discharges be provided for in the provisions of the plan:

> The critical question, then, is whether the phrase 'employee benefit plan,' as used by Congress here to include a 'retirement, pension, or insurance plan,' encompasses only the rules defining what benefits retirees receive, or whether it also encompasses *rules mandating retirement at a particular age.* 434 U.S. at 210, 98 S.Ct. at 454. [Emphasis supplied].

In *Marshall v. Hawaiian Telephone Company,* 575 F.2d 763 (9th Cir. 1978), the Department of Labor (the "Department") argued that the company had improperly discharged several employees because of their age before they reached 65. The Ninth Circuit noted that the plan "explicitly provides that [the employer] may retire any employee who has attained age 60." 575 F.2d at 766. [Footnote omitted]. The Department argued that the employer did not "observe the terms" of its plan within the meaning of § 4(f)(2) unless the plan *required* the employer to retire employees at a certain age.

The Ninth Circuit concluded that § 4(f)(2) permits "an employer to exercise the option of retiring employees *pursuant to* a bona fide retirement plan even where the plan does not require such retirements." *Id.* at 767. [Footnote omitted and emphasis supplied]. Thus the question whether an employer has "observe[d] the terms" of the

plan when it forces an employee to retire must be resolved by examining the provisions of the plan to see if an employer is expressly permitted to require retirement at a particular age. Again the case would not make sense if express plan provisions about involuntary retirement were not essential.

*Zinger v. Blanchette*, 549 F.2d 901 (3rd Cir. 1977), *cert. denied*, 434 U.S. 1008, 98 S.Ct. 717, 54 L.Ed.2d 750 (1978), involved a pension plan similar to the one in *Hawaiian Telephone, supra*, in that it expressly provided that the employer could either retire an employee after he reached 60 or retain him until he reached 65. The Third Circuit found that one of the purposes of the ADEA was to eliminate age-based discharges without benefits. It also noted that Congress had regarded retirement on an adequate pension favorably and had enacted § 4(f)(2) to make such retirements exempt, although discharges without substantial benefits were not covered by the exemption. The court concluded that since the plan in question paid benefits, it could not be a subterfuge to evade the purposes of the ADEA because the ADEA was not meant to affect retirements on an adequate pension.

This Court has also held that § 4(f)(2) applies when a plan expressly gives an employer the option of forcing retirement at an age under 65 or of permitting an employee to work until 65. *Minton v. Whirlpool Corporation*, 569 F.2d 1012 (7th Cir. 1978). In both these cases it was the plan which expressly conferred on the employer the right to force the employee to retire prior to 65.[3]

These cases demonstrate that not all age-based discharges are forbidden by the ADEA simply because § 4(f)(2) allows an employer to force an employee to retire on account of his age under a retirement plan *which pays benefits*. It is also important that a retirement plan gives the employee notice of the age at which the employer may force him to retire, since the lack of such notice deprives the employee of an adequate understanding of his financial and other expectations under the plan. Congress would not have exempted from ADEA liability an age-based retirement pursuant to a plan if the plan did not give the employee sufficient information to enable him to plan for his retirement or to negotiate with his employer for some other mutually acceptable arrangement.

In the instant case, BRIP authorizes involuntary retirement at 65, but it does not expressly provide that Beatrice can force employees to retire before that time. BRIP does indicate that an employee may elect early retirement and receive a pension under certain circumstances. Only one case involving a similar plan has been brought to our attention in which the question presented by the instant case was directly posed. Thus in *Marshall v. Kimberly-Clark Corporation*, 14 Empl.Prac.Dec. ¶ 7630 (N.D.Ga. 1977), the employer sought, on the basis of the substantial pension benefits the employee would receive, to apply the § 4(f)(2) exception to the termination of an older employee, even though the pension plan did not provide for involuntary age-based terminations before age 65. In rejecting this approach, the court said:

> By the terms of the retirement policy, each employee of the defendant is mandatorily retired at age 65 unless the company chooses to extend his employment on a yearly basis thereafter. Although an employee may elect to retire and receive benefits as early as age 55, there is no provision for involuntary retirement before age 65.
>
> [The employee in question] was separated when he was 61 years of age. His claim is based on the alleged involuntary nature of this action, and, if his allegations are substantiated, *his retirement would not have conformed to the defendant's retirement policy* and the exemption

---

**3.** Although this Court's opinion in *Minton* does not set forth the terms of the plan, we note that the district court opinion stated that the plan gave the employer the option of retiring the employee at age 55 or continuing to employ him. (*Minton v. Whirlpool Corporation*, EV 76103C, (S.D.Ind. June 1, 1977), Finding of Fact No. 5).

in 29 U.S.C. § 623(f)(2). The cases cited by the parties construing the retirement plan exemption concern involuntary retirement *expressly permitted* by the company program. [citations omitted]. While the court is obliged to follow the literal language of the exception [citation omitted], there is no duty to extend it to encompass the situation here. 14 Empl. Prac.Dec. ¶ 7630 at 5099. [Emphasis supplied].[4]

In the instant case Sexton argued that Beatrice could not lawfully force him to retire because of his age before age 65 because BRIP did not authorize Beatrice to do so. Sexton cited *Kimberly-Clark, supra,* but the district court did not find that case persuasive. The district court agreed that BRIP did not articulate Beatrice's right to force an employee to retire because of age before 65, but the court noted that at common law Beatrice could fire Sexton because of his age without limitation. The court apparently reasoned that such an extrinsic common law right to terminate the employment relationship, coupled with benefits provided by BRIP, were sufficient to make the termination one which "observe[d] the terms" of the plan. The court found that it was not necessary to have the employer's right to terminate the employment relationship expressly incorporated into the plan.

The district court in the instant case relied on *Marshall v. Baltimore & Ohio Railroad Company,* 461 F.Supp. 362 (D.Md. 1978), *appeal pending,* Nos. 79–1210 and 79–1211 (4th Cir.) for the proposition that an employer "observe[d] the terms" of a plan within the meaning of § 4(f)(2) when it forced employees to retire before the normal retirement age even if the plan did not provide that the employer could do so, so long as the plan paid benefits. The district court here likewise rejected Sexton's argument that the ADEA abrogated Beatrice's common law right to fire Sexton because of his age. As will be explained below, we conclude that the district court erred in relying on *B & O* and misunderstood the effect of the ADEA on Beatrice's common law right to discharge Sexton because of his age.

The facts of *B & O, supra,* differ crucially from those of the instant case. The B & O experienced a severe loss of revenue in 1971 due to a nationwide coal strike. In order to reduce expenses it decided to terminate 142 workers who were entitled to pension benefits prior to their mandatory retirement age of 65 because they would presumably "be less adversely affected by the loss of a job than individuals who were not entitled to receive pension benefits." 461 F.Supp. at 367. One of the issues presented in the case was whether the B & O "observe[d] the terms" of its plan within the meaning of § 4(f)(2) when it retired these workers prior to their mandatory retirement age because the plan did not expressly provide that the B & O could do so.

In *B & O* the district court noted that, although the plan did not expressly provide that the B & O could force employees to retire before age 65, the B & O contended "and the Department [of Labor] *does not dispute,* that they have always had the inherent right to terminate any employee for any legitimate reason." 461 F.Supp. at 373. [Emphasis supplied]. The court in *B & O* also made a specific finding that the option to retire employees involuntarily had been "exercised over the years" by the employer. 461 F.Supp. at 375. Thus, in *B & O* the court found that the employer's historical retirement policy and system provided for involuntary age-based terminations before 65 even though the B & O's power to do so was not set forth in its pension plan.[5] The plaintiff Department of Labor in *B & O*

---

4. The district court later granted Kimberly-Clark's renewed motion for summary judgment on the ground that the suit was barred by the statute of limitations. 17 Empl.Prac.Dec. ⸫ 8396 (N.D.Ga.1978).

5. That the employer's long-standing policy had been to terminate employees before 65 because of their age and that this policy was known to and accepted by the employees was made clear by the fact that, although the employer had apparently terminated unionized employees under this policy, the court made no reference to any union grievances over such discharges.

apparently did not argue that the ADEA altered the B & O's common law right to discharge employees because of age. These findings formed the basis for the court's conclusion of law that the railroad had "observe[d] the terms" of its retirement policy.

In the instant case, however, the district court specifically found that: "BRIP contains no . . . articulation of Beatrice's authority to discharge its employees for this reason [age]" and Sexton has not conceded that Beatrice has power to do so by virtue of its common law rights. Further, nothing in the record suggests that Beatrice had an historical plan, policy or practice of discharging employees because of age before age 65.[6]

Thus the district court erred in concluding that *B & O* controlled the instant case because the two factors which determined the result in *B & O* are not present in the instant case, i. e.: (1) there is no evidence that Beatrice had an historical practice or policy similar to that in *B & O* and (2) Sexton has not conceded that Beatrice had an "inherent" or common law right to fire Sexton because of his age, absent some provision in BRIP authorizing Beatrice to do so. On the contrary, the extent to which the ADEA has abrogated Beatrice's common law right to force an employee to retire because of his age is the underlying issue presented by this appeal.

Beatrice ignores the effect of the ADEA when it argues that its common law right to discharge an employee for any reason makes it unnecessary for the BRIP to provide expressly that it can force employees to retire before their normal retirement age because of their age. We agree that, in general, the employment contract governs the employer's right to discharge an employee and the pension plan does not affect these rights. We also agree that at common law an employee could be discharged for any reason, including age. However, § 4(f)(1) of the ADEA abrogates the employer's common law right to discharge an employee because of age and makes it illegal for the employer to do so. Thus the relevant consideration is not the effect of the employment contract or common law master and servant principles but the federal statutory prohibition of age-based discharges.

In this limited respect the ADEA makes the terms of the pension plan which relate to the employer's right to force retirement at a particular age of controlling importance because, as explained below, in order to come within the limited exemption of § 4(f)(2), the plan must contain express provisions on this point. That at common law, to sanction discharge for age, no employment contract or pension plan provisions were required is irrelevant to the construction of § 4(f)(2). This is true because the ADEA has eliminated the employer's right to discharge an employee because of his age except as provided in § 4(f)(2). We therefore reject Beatrice's argument that this common law right (which was sharply curtailed by the ADEA) should guide the construction of this limited exception to the general prohibition of the ADEA.

Having determined that *B & O* may be distinguished from the instant case and that the ADEA had a significant effect on Beatrice's common law right to discharge an employee because of his age, we turn to the question whether Beatrice may avail itself of § 4(f)(2) even though BRIP did not expressly authorize Beatrice to discharge Sexton because of his age before the normal retirement age. We conclude that under the circumstances of the instant case, Bea-

---

**6.** The district court presumably could not have made such a finding of fact because of the undisputed statement contained in Sexton's affidavit that:

As the second highest official of the Sexton Division, I was aware of the termination of employees covered by BRIP. I know of no case in which an employee was forced to retire against his will. There were cases where employees under the age of 65 were terminated for cause and, because of their age and length of service, were eligible to draw upon their vested benefits accounts. In none of these cases to my knowledge was the existence of early retirement benefits under BRIP given as the justification for the termination or was the termination the result of the provisions of BRIP.

trice may not avail itself of the exception unless BRIP has such a provision.[7]

■ Section 4(f)(2) is an exception to a remedial statute and such exceptions are, in general, to be narrowly construed:

Any exemption from such humanitarian and remedial legislation must . . . be narrowly construed, giving due regard to the plain meaning of statutory language and the intent of Congress. To extend an exemption to other than those plainly and unmistakably within its terms and spirit is to abuse the interpretative process and to frustrate the announced will of the people. *A. H. Phillips, Inc. v. Walling,* 324 U.S. 490, 493, 65 S.Ct. 807, 808, 89 L.Ed. 1095 (1945).

*See also Piedmont & Northern Railway Co. v. Interstate Commerce Commission,* 286 U.S. 299, 311–12, 52 S.Ct. 541, 545, 76 L.Ed. 1115 (1932). Section 4(f)(2) must therefore "be narrowly and strictly construed." *Marshall v. Eastern Airlines, Inc.,* 474 F.Supp. 364, 368 (S.D.Fla.1979).

■ We also note that "[i]n order to qualify for the exemption, an employer must show that it was observing the terms of a bona fide pension plan which was not a subterfuge . . . .. Moreover, the burden of proof rests on the employer." *Marshall v. Atlantic Container Line, G.I.E.,* 18 Empl.Prac.Dec. ¶ 8849 at 5508, *motion for summary judgment reconsidered and granted,* 470 F.Supp. 71 (S.D.N.Y.1979). *Accord, Marshall v. Eastern Airlines, supra,* 474 F.Supp. at 368.

Since we must construe § 4(f)(2) narrowly, we conclude that in this context an employer does not observe the terms of the plan unless the plan expressly sanctions the decision to force the employee to retire early as well as the decision to pay him substantial benefits. Both of these decisions must be pursuant to some express provision in the plan if the employer wishes to claim that he observed the terms of the plan by forcing an employee to retire early. This follows from the language and analysis

of *McMann, supra,* and other cases dealing with § 4(f)(2) and is in accordance with *Kimberly-Clark, supra,* the only case in which the precise issue involved in the instant case was presented.

In addition, the Secretary of the Department of Labor, to whom enforcement and interpretation of the ADEA was committed by Congress, issued interpretative regulations soon after the passage of the Act describing the scope of the § 4(f)(2) exception. *See* 34 Fed.Reg. 322 (1969). The regulations, which are presently codified at 29 C.F.R. § 860.110 (1980), have consistently provided that, for an age-based discharge to fall within the exception, the plan must contain a stipulated age for involuntary early retirement:

Thus, the Act authorizes involuntary retirement irrespective of age, provided that *such retirement is pursuant to the terms* of a retirement or pension plan meeting the requirements of section 4(f)(2). The fact that an employer may decide to permit certain employees to continue working beyond *the age stipulated in the formal retirement program* does not, in and of itself, render an otherwise bona fide plan invalid insofar as the exception provided in section 4(f)(2) is concerned. [Emphasis supplied].

Regulations promulgated by the enforcing agency are entitled to great deference. *Griggs v. Duke Power Co.,* 401 U.S. 424, 433–34, 91 S.Ct. 849, 854–855, 28 L.Ed.2d 158 (1971).

An analysis of the legislative history also supports the conclusion that the terms of the plan must authorize pre-65 involuntary retirement. Congress' intent in enacting the exception contained in § 4(f)(2) was to allow involuntary termination only where so provided in employee benefit plans. The bill that ultimately became the ADEA embodied the recommendations made by President Johnson in his Message to Older Americans submitted to Congress on January 23, 1967. The President had specifically sug-

---

**7.** We do not find it necessary to decide whether the employer could avail itself of § 4(f)(2) under facts similar to those in *B & O, supra.* That

is we do not decide whether historical practice is an adequate substitute for an express provision of the plan.

gested an exception for those "special situations . . . where the employee is *separated under* a regular retirement *system.*" 113 Cong.Rec. 1089–90 (1967). [Emphasis supplied].

Section 4(f)(2) of the Administration bill (S. 830, 90th Cong., 1st Sess.) made clear that the termination decision had to be based upon the provisions of the retirement plan:

It shall not be unlawful for an employer, employment agency, or labor organization . . . *to separate involuntarily an employee under a retirement policy or system* where such policy or system is not merely a subterfuge to evade the purposes of this Act.[8] [Emphasis supplied].

Congressman Dent, Chairman of the House Subcommittee on Labor, to which the bill had been referred, clarified the intent of this legislation by pointing out that it was drafted with private pension plans containing stipulated involuntary retirement ages specifically in mind. Thus he commented during the House Hearings on the identical companion bill: "Many private pension funds lower the retirement age to 55 and 60." [9]

Section 4(f)(2) of the Administration bill was amended in response to concerns expressed by Senator Javits that, as originally written, the exception would force employers to grant identical pension and other benefits to newly-hired older workers. Senator Javits feared that this aspect of the bill would discourage employers from hiring older workers. Senate Hearings, at 24, 27–28. These concerns were also expressed by representatives of many other groups which testified before the Subcommittees. *See* Senate Hearings, at 112–13, 296 and 323 and House Hearings, at 62–69, 413, 418, 481, 483 and 496–99.

Secretary of Labor W. Willard Wirtz, the Administration's spokesman, was asked during his testimony before the House Committee whether Senator Javits' proposed changes would change the substance of the exemption as contained in S. 830. He explained that they would not:

In the bill reported out by the subcommittee in the Senate there is a change in the language which refers to the point which you raised earlier, the relationship of this to established pension plans. We count that change as not going to the substance and involving matters going to clarification which would present no problem. House Hearings, at 40.

Secretary Wirtz also explained that the purpose of the prohibitions in Section 4 was to provide protection against arbitrary age-based discharges except when such discharges were pursuant to an established retirement policy:

Section 4(a) . . . reflects simply the significant fact that what we are doing here is to extend to individuals in situations not covered by collective bargaining agreements or *established retirement policies,* a degree of protection against discrimination on the basis of age very much like what has evolved in private experiences and programs. Senate Hearings, at 43. [Emphasis supplied].

This statement by Secretary Wirtz is crucial to an understanding of the problems involved in the instant case. The exception provided in § 4(f)(2) seeks to immunize involuntary terminations which are pursuant to *established retirement policies and programs.* An indispensable element of any such *policy or program* is the creation on a non-discriminatory basis, of some consistent expectation of when retirement will take place and what benefits will be available when that time comes. Certainly, *established retirement policies* do not contemplate the indiscriminate firing of employees motivated by age as a matter of the employer's common law prerogative simply because the fired employee becomes eligible for some pension benefits.

---

**8.** *Hearings on S. 830 Before the Subcomm. on Labor of the Senate Comm. on Labor and Public Welfare,* 90th Cong., 1st Sess., at 6–7 (1967) (hereinafter referred to as "Senate Hearings").

**9.** *Hearings on H.R. 4221 Before the General Subcomm. on Labor of the House Comm. on Education and Labor,* 90th Cong., 1st Sess., at 69 (1967) (hereinafter referred to as "House Hearings").

We therefore believe that the court in *Kimberly-Clark, supra,* was correct when it concluded that the § 4(f)(2) exemption is not available unless the plan empowers the employer to force an employee to retire before his normal retirement age. The legislative history, the consistent interpretation given the statute by the Department of Labor in its regulations and the controlling judicial decisions all strongly support the proposition that an involuntary termination made prior to "normal retirement age," which is not expressly authorized by the terms of the plan is not immunized by the provisions of § 4(f)(2).

2. INTERPRETATION OF BRIP.

■ Having concluded that Beatrice may not rely on the § 4(f)(2) defense unless BRIP expressly provided that Beatrice could force employees to retire prior to the normal retirement age, we must examine BRIP to determine whether it contains such a provision. We conclude that it does not.

Section 2.1 of BRIP is entitled "Normal Retirement and Pension." It provides for normal retirement at age 65 and is set forth in the margin.[10]

Section 3 is entitled "Early Retirement Pension" and provides for the provision of benefits to those who retire at or after age 55 but before age 65, and is set forth in the margin.[11]

We agree with the district court's conclusion that these provisions do not give Beatrice the right to force Sexton to retire before his normal retirement age. This interpretation is buttressed by statements contained in a booklet Beatrice issued to participants in BRIP which described its terms. The booklet in effect when Sexton was discharged made it plain that BRIP did not provide for involuntary early retirement. Instead the booklet explained that early retirement was solely at the option of the employee:

## WHEN MAY I RETIRE?

### NORMAL RETIREMENT

Your Normal Retirement Date is the first day of the month on or just after your 65th birthday. If you terminate employment on this date with five or more years of Continuous Service, you will start receiving your monthly pension immediately.

### EARLY RETIREMENT

*You may elect early retirement* once you have reached your 55th birthday, if you have completed 10 years of Continuous Service. [Emphasis supplied].

The only provision in BRIP which arguably might give Beatrice the right to force workers to retire was contained in Section

10. Section 2.1 of BRIP provides as follows:
    Normal Retirement Date shall be the first day of the month coincident with or next following a Participant's sixty-fifth (65th) birthday. A Participant whose employment with all Employers terminates on or after his Normal Retirement Date and who, at his Normal Retirement Date, has in the aggregate five (5) or more years of Continuous Service, shall be entitled to receive a monthly Normal Retirement Pension payable monthly commencing on the first day of the month coinciding with or next following the date of such termination of employment in an amount equal to the sum of (a) and (b) below
    . . . .

11. Section 3 of BRIP provides as follows:
    A Participant whose employment with all Employers terminates on or after the date he has attained age fifty-five (55) shall be eligible to receive an Early Retirement Pension commencing at any time between the first day of the month coinciding with or next

following his actual date of termination of employment and his Normal Retirement Date, provided that he then has in the aggregate ten (10) or more years of Continuous Service. The monthly amount of such Early Retirement Pension, commencing on his Normal Retirement Date, shall be equal to his Accrued Benefit or the minimum monthly Retirement Pension, determined in accordance with Section 2.2, whichever is applicable; provided, however, if payment of the Early Retirement Pension shall commence prior to the Participant's Normal Retirement Date, the amount of such Early Retirement Pension shall be actuarially reduced for early payment. Such a Participant may elect to commence receiving his Early Retirement Pension prior to his Normal Retirement Date by an instrument in writing executed and delivered by him to the Committee at least thirty (30) days prior to the commencement date.

11. It was entitled "Miscellaneous" and is set forth in pertinent part in the margin.[12] Such a general provision does not give Beatrice the power to force employees to retire before the normal retirement age for purposes of a § 4(f)(2) defense for two reasons.

First, the language of Section 11.1 itself is too broad and vague to be read as giving Beatrice this power. Far more than niceties of draftsmanship are involved in the requirement that the right of the employer to force retirement be expressly included in the Plan itself. Aside from its obvious purpose to provide financial benefits, one of the paramount purposes of a retirement plan or program is to put employees on notice when they may reasonably expect to be terminated, or retired. Certainly it is a far different thing to retire an employee at age 55 (even with "substantial" benefits) than to allow him the benefit of a regular salary until age 65 and *then* retire him with (presumably enhanced) "substantial" benefits. Thus, if an employee knows that he has a realistic expectation of forced retirement at, for example, age 55, and he elects to continue to work for his employer on this basis, some elements of the potential unfairness and discrimination of early retirement have been removed. In addition, an employee having realistic notice that he may face early retirement may have an opportunity to make provisions through savings, through the securing of a second job, and otherwise for the contingencies which he faces. Fair notice, consistency and the absence of discrimination are the touchstones of policy in this area.

Second, even if we were to conclude preliminarily that Section 11.1 in a vacuum were clear enough to give employees notice that Beatrice could terminate them because of their age prior to 65, the notice would be rendered insufficient by Beatrice's booklet describing the plan in layman's language, because it does not mention Beatrice's power to do so. Rather, the booklet states that each employee over 55 who has the requisite seniority may *elect* early retirement. Since the language used in the booklet contradicts the language of Section 11.1 read in a light most favorable to Beatrice, it cannot be argued that Section 11.1 is sufficient for purposes of § 4(f)(2).

We therefore conclude that BRIP does not expressly permit Beatrice to discharge Sexton under these circumstances so we reverse the judgment of the district court and remand for proceedings not inconsistent with this opinion.[13]

Reversed and Remanded.

BAUER, Circuit Judge, concurring.

I concur in the judgment. No provision of the Beatrice retirement plan can be construed as granting Beatrice the option to compel the involuntary retirement of an employee prior to age sixty-five. Accordingly, it is impossible for Beatrice to have "observed" a non-existent term of the retirement plan and therefore impossible for Beatrice to claim an exemption under Section 4(f)(2) of the Act. No more need be said.

12. Section 11.1 of the Plan provides:

11.1 *No Enlargement of Participant Rights*
This Plan is strictly a voluntary undertaking on the part of the Participating Employers and shall not be deemed to constitute a contract with any Participant, or to be considered for, or an inducement to, or a condition of, the employment of any Participant. Nothing contained in this Plan shall be deemed to give any Participant the right to be retained in the service of any Employer or to interfere with the right of any Employer to discharge or retire any of its employees at any time. No Participant shall have any right to or interest in any portion of any fund arising from the contributions by the Participating Employers under this Plan, other than as herein specifically provided. No person shall have any right to a retirement pension under this Plan, except to the extent provided herein.

13. Sexton also argued on appeal that Beatrice did not "observe the terms" of BRIP because it did not use the term "retirement" or mention his pension when it discharged him. Since we reverse the grant of summary judgment on other grounds we do not reach this issue.