**George H. GERMANN, etc., Plaintiff,**

v.

**Richard David LEVY, et al., Defendants.**

**No. 81 C 367.**

United States District Court,
N.D. Illinois, E.D.

Dec. 13, 1982.

See also D.C., 531 F.Supp. 357.

Lewis M. Schneider, Pretzel, Stouffer, Nolan & Rooney, Chartered, Chicago, Ill., for plaintiff.

Barbara B. Hirsch, Chicago, Ill., for Midland Hotel Corp.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

George H. Germann ("Germann"), as executor of the estate of Godfrey J. Carlson ("Carlson"), sues various defendants (collectively "Midland"), asserting Midland violated the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621–34, by providing Midland employee Carlson less life insurance coverage than similarly situated employees under age 60. Both sides have now moved under Fed.R.Civ.P. ("Rule") 56 for summary judgment. For the reasons stated in this memorandum opinion and order, Midland's motion is granted and Germann's is denied.

### Facts[1]

Midland first employed Carlson (then age 62) in August 1977. Carlson remained in

---

1. There is no real disagreement on the relevant facts. Because summary judgment is granted in Midland's favor, the factual account in this opinion reflects reasonable inferences from the

factual record buttressing Germann's position. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). Where—as here—a party's *intention* is rele-

Midland's employ until his death February 3, 1979, when he was 64. As a Midland employee Carlson was covered by the company's non-contributory group policy (the "Policy") issued by Guardian Life Insurance Company of America ("Guardian"), providing major medical, basic health, basic term life and accidental death/dismemberment insurance (the latter affording the same coverage as the term life portion).

Except for the life and accidental death/dismemberment insurance components, the amount of Policy coverage afforded each Midland employee did not depend on age. But those two components involved a change once an employee reached age 60. Until that age the coverage was a function of the employee's occupational classification. Thus Carlson, as an auditor for Midland, would have had $20,000 in life insurance coverage had he been hired and died as a Midland employee before reaching 60. Such coverage was automatically reduced to $1,000 for any Midland employee (including Carlson) in the 60–64 age bracket (regardless of job category) and to $500 for any employee 65 or older.

Midland had not set out to acquire any life insurance coverage for its employees— like most employers in the competitive marketplace, it was looking to obtain one of today's expected "fringe benefits": group major medical and hospitalization insurance. It instructed its agent, Donchin-Hecht & Co. ("Donchin-Hecht"), to survey the field to enable Midland to provide those two types of coverage.

Donchin-Hecht solicited bids from numerous insurance carriers and ultimately selected Guardian January 28, 1972. All insurers surveyed by Donchin-Hecht included life insurance coverage in their package proposals (though not solicited to do so by Donchin-Hecht).[2] And each incorporated a provision cutting back such coverage with age as part of its non-negotiable insurance package. Guardian's interrogatory answer in this case characterized that cutback as "standard company procedure."

Guardian charged Midland the same composite rate for each employee covered by the Policy. Actuarial data—including the group's age composition—was used internally by Guardian to calculate the composite premium.[3] Guardian's rate thus reflects (1) the weighted average of the actuarial costs of insuring Midland employees in each age bracket and (2) its profit margin.

---

vant, the drawing of inferences poses somewhat different problems. How is the party opposing judgment to adduce facts countering the movant's statement of intention? Was it Judge Learned Hand who spoke of our inability to know the mind of man though twenty bishops should swear to it? It is thus understandable that courts have sometimes spoken of their reluctance to grant summary judgments where intent is a relevant fact. *Poller v. CBS,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962). At the same time, where statements of intention are consistent with common experience and nothing in the objective fact pattern casts doubt on those statements, there is no reason to force a case to go to trial on the premise that only thus can an uncontroverted witness' credibility be determined. As our Court of Appeals recently said in *Thornton v. Evans,* 692 F.2d 1064 at 1075 (7th Cir.1982):

> We are always hesitant to grant summary judgment when subjective matters—here Kleindienst's knowledge with respect to the Family Provider bank account—are material to the case.... On the other hand, we are mindful that a court should not shrink from granting summary judgment, if authorized and appropriate, to avoid needless trials.

> *Kirk v. Home Indemnity Co.,* 431 F.2d 554, 559–60 (7th Cir.1970).

**2.** Because of the nature of their charters under state insurance codes, life insurance companies apparently always include a life insurance component in selling such package policies. Interestingly in this respect, the affidavit of Eugene Pekow (President of Midland Hotel Corporation) attaches as an exhibit the Illinois State Bar Association "$1,000,000 Major Medical Expense Plan" and "$1,000,000 Major Medical Insurance Plan" offered to its members as a group plan. That plan, written by MONY (Mutual Life Insurance Company of New York), also follows the typical pattern by providing a term life insurance component—and it cuts back from $5,000 before age 60 to $2,500 at that age, then vanishes entirely at age 65. As Germann would have it, any law firm seeking to provide major medical coverage for its employees and purchasing that package would be at peril under ADEA.

**3.** Guardian did not disclose its methodology to Midland. Like all such insurers, it simply quoted a package price to Donchin-Hecht.

If Guardian's confusing (and at times contradictory) actuarial information is interpreted in the light most favorable to Germann,[4] a comparison between the effective costs to Midland (on which the composite rate was based) of insuring its employees in the 55–59 and 60–64 age brackets reveals:

    1. Costs of the basic health and major medical benefits provided to the older group were significantly higher than costs incurred for the younger group.[5]

    2. Costs of the reduced life insurance (as well as accidental death/dismemberment insurance) afforded the older group were appreciably less than the costs of the life insurance coverage provided the younger group.

    3. *Overall* cost of covering a member of the older group was less than that incurred on behalf of an employee in the younger group (i.e., the cost differential in Paragraph 2 exceeded that in Paragraph 1).

    4. Had the difference in overall cost referred to in Paragraph 3 been applied to provide increased life and accident/dismemberment insurance coverage for each employee in the 60–64 bracket (at the same rates used in Guardian's internal calculations of Midland's cost), an added $6,569 in insurance would have been furnished.

As already indicated at n. 3, Midland was never informed of the actuarial basis underlying the uniform composite rate charged per employee. It was wholly unaware of any negative differential in the cost of insuring an employee in the 60–64 age range

vis-a-vis his or her counterpart in the 55–59 bracket.

### Summary Judgment

Midland does not deny it "discriminated" against Carlson on the basis of his age by purchasing a group insurance policy that afforded less life insurance coverage to employees over 59.[6] Instead Midland calls on two affirmative defenses in its effort to avoid liability under ADEA:

    1. Guardian's life insurance cutback provisions were assertedly part of a bona fide insurance plan that was not intended as a subterfuge to evade the Act. Those facts would make Midland's conduct lawful under ADEA § 4(f)(2), 29 U.S.C. § 623(f)(2).

    2. In purchasing the Policy Midland relied in good faith on a Department of Labor regulation (29 C.F.R. § 860.120) applying ADEA's § 4(f)(2) defense to insurance plans in which the payments made by an employer for benefits on behalf of younger workers are equal to those made on behalf of older workers. *See* 29 U.S.C. § 626(c) (applying to the Act the good faith reliance immunity established by the Portal-to-Portal Act, 29 U.S.C. § 259).

Disputing the availability of both defenses, Germann counters that Midland in fact contributed less for employees in the 60–64 age group than for those in the 55 to 59 bracket. Because this Court finds Midland entitled to summary judgment under ADEA § 4(f)(2), Midland's probable inability to prevail on its alternative ground becomes irrelevant.[7]

---

**4.** Guardian's Associate General Counsel Emily S. Crandall ("Crandall") supplied information in response to four sets of interrogatories. In her June 30, 1982 answers Crandall provided data concerning Guardian's "average cost" of providing each type of coverage under the Policy for Midland employees in the 55–59 and 60–64 age brackets. Crandall's September 15, 1982 answers reported on Midland's effective costs of covering employees in the same two age groups. Inexplicably, the two sets of answers indicate Guardian's average costs significantly *exceed* the costs to Midland, thus raising serious questions as to the accuracy of this data. Nevertheless, this Court has accepted

Germann's interpretation of the data for purposes of Midland's motion.

**5.** As will be recalled, the benefits furnished under these components of the Policy did not vary by age.

**6.** "Discriminated" is used to denote an objective difference in treatment, with no pejorative inference intended. For the reasons discussed in the text, discrimination does not necessarily equate with liability.

**7.** Without extended analysis of the problem, this Court notes Midland makes no effort to

*ADEA § 4(f)(2) Defense*

Before its 1978 amendment ADEA § 4(f)(2) provided:

> (f) It shall not be unlawful for an employer, employment agency, or labor organization....
>
>> (2) To observe the terms of a bona fide seniority system or any bona fide employee benefit plan such as a retirement, pension or insurance plan, which is not a subterfuge to evade the purposes of this chapter, except that no such employee benefit plan shall excuse the failure to hire any individual.... [8]

To prevail under that section Midland must satisfy three criteria: It must have been (1) *observing the terms* (2) of a *bona fide* insurance plan (3) that is not a *subterfuge* to avoid compliance with ADEA.

Each of the first two elements is certainly present. As for the first, the Policy itself dictated curtailment of Carlson's life insurance coverage. *See Sexton v. Beatrice Foods Co.,* 630 F.2d 478, 486 (7th Cir.1980) (to meet the "observe the terms" requirement, the plan must "expressly sanction" the challenged discriminatory treatment). And as for the second, the Policy is "bona fide" because it "has truly existed and actually paid benefits to" Carlson. *Smart v. Porter Paint Co.,* 630 F.2d 490, 494 (7th Cir.1980).

Thus the third element—the "subterfuge" provision—is the key to this case. It may be met either by a subjective or by an objective showing.[9] As to the subjective—and more conventional—meaning of "subterfuge" as used in ADEA, *United Airlines, Inc. v. McMann,* 434 U.S. 192, 203, 98 S.Ct. 444, 450, 54 L.Ed.2d 402 (1977) teaches:

> In ordinary parlance, and in dictionary definitions as well, a subterfuge is a scheme, plan, stratagem, or artifice of evasion. In the context of this statute, "subterfuge" must be given its ordinary meaning and we must assume Congress intended it in that sense.

Midland has uncontrovertedly—and convincingly as well (see n. 1)—shown its plan was "not a subterfuge to evade the purposes of" ADEA.

As the affidavits of Donchin-Hecht's Martin Weininger and Midland's Eugene Pekow show conclusively, Midland was looking only for major medical and hospitalization insurance coverage for its employees.[10] It was nonetheless presented by *every* insurance carrier from which Donchin-Hecht obtained quotations with a package requiring that Midland buy some life insurance coverage as well. *Each* policy had a provision cutting back the life insurance

---

prove *reliance* on the regulation—the fulcrum of its second claimed defense. Indeed it fails to show it had any awareness of the regulation at all (obviously essential to reliance on it).

**8.** In 1978 the exception to the "not a subterfuge" defense was expanded to read:

> ... except that no such employee benefit plan shall excuse the failure to hire any individual, and no such seniority system or employee benefit plan shall require or permit the involuntary retirement of any individual specified by section 631(a) of this title because of the age of such individual....

That amendment is of course irrelevant to the issues presented here (and even were it relevant, it would likely be inapplicable retroactively, *see EEOC v. Home Ins. Co.,* 672 F.2d 252, 257 n. 6 (2d Cir.1982)).

**9.** In the latter respect—the objective aspect— the Department of Labor has issued regulations approving insurance plans that, though they may on their face provide lesser benefits for older employees, do so only as a reflection of the greater age-related cost of those benefits. 29 C.F.R. § 860.120. According to that administrative interpretation of ADEA § 4(f)(2), such a plan is not a "subterfuge" if "the actual amount of payment made, or cost incurred, in behalf of an older worker is equal to that made or incurred in behalf of a younger worker, even though the older worker may thereby receive a lesser amount of... insurance coverage." Because the regulation does not even allude to the employer's intent (the more normal reading of a "subterfuge" standard), Germann cannot invoke it to impute a "subterfuge" label as a matter of law to insurance plans that do not meet the equal-cost test.

**10.** Interestingly, Guardian's actuarial data reveals Midland effectively paid *greater* premiums to provide major medical and hospitalization coverage for employees in the 60–64 age bracket (including Carlson) than for younger employees.

coverage with advancing age. None of the insurers made Donchin-Hecht (or of course Midland) privy to the basis on which they calculated their rates and made their quotations.

Common sense tells all of us (as is the fact) that the incidence of medical and hospitalization expenses, and hence the cost of medical and hospitalization insurance, increase as we get older. By definition the same money buys less coverage with increasing age. And of course life insurance follows the same pattern. It follows logically then that some lesser amount of life insurance for older employees can represent equal treatment of those employees. A fortiori, coupling life insurance coverage with equal medical and hospitalization coverage for all employees permits an even greater disparity in the face amount of life insurance without any inequality of financial treatment of the older employee group.

Finally it is uncontroverted that Guardian's insurance proposal, "both as to rates, provisions and extent of coverage, was presented to Midland to either accept or reject without negotiation as to coverage or rates." Midland had no *knowledge* that Guardian's internal numbers were not wholly cost-responsive to age differentials. Nothing specifically put Midland on inquiry in that regard (if indeed a failure to inquire can ever be implied as a substitute for the wilfulness required by the *McMann* definition).

This is not the stuff of which a "subterfuge" can be found. Certainly nothing in the record raises a material fact issue in that respect, and Midland therefore satisfies ADEA's § 4(f)(2) as a matter of law.

### Conclusion

There is no genuine issue of material fact, and Midland is entitled to a judgment as a matter of law. This action is dismissed with prejudice.