**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,**

v.

**The BALTIMORE AND OHIO RAILROAD COMPANY, and the Chesapeake and Ohio Railway Company, Defendants.**

Civ. A. No. N–74–637.

United States District Court, D. Maryland.

Feb. 17, 1983.

Michael N. Martinez, Michael A. Middleton, Daniel M. Williams, Jr., Paul D. Brenner, John K. Light, E.E.O.C., Washington, D.C., for plaintiff.

Thompson Powers, Ronald S. Cooper, Morgan D. Hodgson, Ellen Kohn, and Steptoe & Johnson, Washington, D.C., and Thomas L. Samuel, Gen. Atty., Baltimore, Md., for defendants.

## MEMORANDUM

NORTHROP, Senior District Judge.

This action was first filed by the Secretary of Labor, United States Department of Labor (Secretary), on June 19, 1974. In the complaint the Baltimore and Ohio Railroad Company (B & O) and the Chesapeake and Ohio Railway Company (C & O) were charged with violating Section 4 of the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621 *et seq.* (ADEA or the Act). The Secretary contended (1) the defendants unlawfully terminated 142 employees by retiring them based on their age-related entitlement to a pension and (2) the defendants unlawfully amended their pension plans in 1972 by lowering the compulsory retirement age for their employees from age 65 to age 62.[1] After a bench trial, this Court found that although the defendants had committed *prima facie* violations of the Act, their conduct fell within the exemption provided by Section 4(f)(2). This Court also determined that the defendants were protected by Section 10 of the Portal-to-Portal Act of 1947, 29 U.S.C. § 259 (1970). *See Marshall v. Baltimore and Ohio R. Co.,* 461 F.Supp. 362 (D.Md.1978).

The United States Court of Appeals for the Fourth Circuit affirmed this Court's finding that the plaintiff had presented a *prima facie* case, but reversed the decision that the defendants' behavior was exempt under Section 4(f)(2) of the ADEA and by the Portal-to-Portal Act. The case was then remanded. *See Equal Employment Opportunity Commission v. Baltimore and*

---

1. The Equal Employment Opportunity Commission (EEOC) was substituted as the plaintiff when Congress enacted legislation transferring enforcement responsibilities of the ADEA to that agency. *See* Section 2 of 1978 Reorg. Plan No. 1, 43 F.R. 19807, 92 Stat. 3781.

*Ohio Railroad Co.,* 632 F.2d 1107 (4th Cir. 1980), *cert. denied,* 454 U.S. 825, 102 S.Ct. 113, 70 L.Ed.2d 98 (1981).

Presently under review is defendants' motion to vacate the Fourth Circuit's decision. *See* Rules 60(b)(5) and (6) F.R.Civ.P. In support of the motion, the defendants cite two newly decided Supreme Court decisions, *Pullman-Standard v. Swint,* 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982), and *American Tobacco Co. v. Patterson,* 456 U.S. 63, 102 S.Ct. 1534, 71 L.Ed.2d 748 (1982), and submit they invalidate the Fourth Circuit's reversal.

The plaintiff agrees with the defendants that Rules 60(b)(5) and (6) permit, in a procedural sense, this Court to entertain the motion to vacate. The parties differ, however, on the substantive issue; to wit, whether the Fourth Circuit's decision comports with *Swint* and *Patterson.*

Federal Rules 60(b)(5) and (6) provide that "the Court may relieve a party . . . from a final judgment, [or] order" if "a prior judgment upon which it is based has been reversed or otherwise vacated" [clause "5"] or for "any other reason justifying relief from the operation of the judgment" [clause "6"].

Under the more traditional view, clause (5) appears to be inapplicable in this case. As Professor Moore described the Rule:
> " . . . it [60(b)(5)] does not authorize relief from a judgment on the ground that the law applied by the court in making its adjudication has been subsequently overruled or declared erroneous in another and unrelated proceeding."

7 *Moore's Federal Practice,* ¶ 60.26[3], at 282.

■ Instead, for a decision to have been "based" on a prior judgment which was subsequently reversed or vacated, the prior judgment must have been a necessary element to that decision. *Morris v. Travisano,* 499 F.Supp. 149, 154 (D.R.I.1980). This principle is usually viewed narrowly so that a Rule 60(b)(5) motion to vacate will be entertained only when a decision actually relied upon was affected in a "res judicata

or collateral estoppel-like" manner by the subsequent reversal. *Marshall v. Board of Education, Bergenfield, New Jersey,* 575 F.2d 417, 424 (3rd Cir.1978). *See Coalition of Black Leadership v. Cianci, Jr.,* 570 F.2d 12 (1st Cir.1978); *Title v. United States,* 263 F.2d 28 (9th Cir.), *cert. denied,* 359 U.S. 989, 79 S.Ct. 1118, 3 L.Ed.2d 978 (1959); *Collins v. City of Wichita, Kansas,* 254 F.2d 837 (10th Cir.1958); *Berryhill v. United States,* 199 F.2d 217 (6th Cir.1952); *Loucke v. United States,* 21 F.R.D. 305 (E.D.Pa.1957).

■ Similarly, clause (6) is usually unavailable as a means of recourse except in the most "extraordinary" circumstances. *Ackermann v. United States,* 340 U.S. 193, 202, 71 S.Ct. 209, 213, 95 L.Ed. 207 (1950). A compelling justification is required for its use. 7 *Moore's Federal Practice,* ¶ 6027[2], at 353. *Twentieth Century-Fox Film Corp. v. Dunnahoo,* 637 F.2d 1338 (9th Cir.1981); *Collins v. City of Wichita, Kansas, supra.* To be sure, Rule 60(b)(6) is not an alternative to or substitute for a timely and proper appeal. *Annat v. Beard,* 277 F.2d 554 (5th Cir.) *cert. denied* 364 U.S. 908, 91 S.Ct. 270, 5 L.Ed.2d 223 (1960); *See Parks v. U.S. Life and Credit Corp.,* 677 F.2d 838 (11th Cir. 1982); *see also Nunnery v. Barber,* 23 F.R. Serv.2d 232 (4th Cir.1977); *Hall v. Warden, Maryland Penitentiary,* 364 F.2d 495 (4th Cir.1966).

■ Nevertheless, either expressly or by inference, courts have interpreted Rules 60(b)(5) and (6) as enabling District Courts to review matters when justice would be served. *Radack v. Norwegian America Line Agency, Inc.,* 318 F.2d 538 (2d Cir. 1963); *United States v. Karahalias,* 205 F.2d 331, 333 (2d Cir.1953). Intervening and supervening Supreme Court decisions can often provide adequate justification. *Patterson v. American Tobacco Co.,* 634 F.2d 744, 746 n. 1 (4th Cir.1980) (*en banc*) *vacated on other grounds sub nom. American Tobacco Co. v. Patterson,* 456 U.S. 63, 102 S.Ct. 1534, 71 L.Ed.2d 748 (1982); *Theriault v. Smith,* 523 F.2d 601 (1st Cir.1975); *Bailey v. Ryan Stevedoring Co., Inc.,* 443 F.Supp. 899 (M.D.La.1978), *rev'd on other grounds,* 613 F.2d 588 (5th Cir.1980), *cert.*

*denied,* 450 U.S. 964, 101 S.Ct. 1479, 67 L.Ed.2d 613 (1981); *Cf. Class v. Norton,* 507 F.2d 1058 (2d Cir.1974); *Griffin v. State Board of Education,* 296 F.Supp. 1178 (E.D. Va.1969); *but cf. Nunnery v. Barber, supra.*[2]

■ Considering the parties dual recognition of this Court's power to entertain the defendants' motion to vacate by examining the holdings of *Swint* and *Patterson,* and the broad discretion to which District Courts are generally entitled when deciding Rule 60(b) motions, particularly in instances such as this where matters affecting great numbers of people are concerned and justice would be served, *Hensley v. Chesapeake & Ohio Railway Co.,* 651 F.2d 226, 229 (4th Cir.1981); *Jones v. Jones,* 217 F.2d 239 (7th Cir.1954), this Court finds it possesses the authority to proceed to consider the specific impact of *Swint* and/or *Patterson* on the Fourth Circuit's decision.[3]

### FACTS

The factual events which underly this dispute were discussed at length in *Marshall v. Baltimore and Ohio R. Co., supra.* Because they weigh so heavily in this decision, they will again be reviewed herein.

During the years 1965–70, the defendants' financial position was declining. Like the railroad industry in general, and particularly in the Northeast corridor, the demand for defendants' freight services waned, while costs steadily increased. Penn Central Railroad buckled in June, 1970, and went into receivership, sending a not so subtle warning to railroad management throughout the country that preventative measures should be taken.

Mr. Hays T. Watkins became President and Chief Executive Officer of the defendant railroads in April, 1971, and began the difficult process of streamlining their operations.[4] To eliminate unnecessary expenses, Mr. Watkins established two priorities: the abandonment of unprofitable branch lines and a reduction in the size of the work force.

The goal of reducing the size of the staff caused railroad management to undertake a review of both the contract (union) and non-contract (supervisory personnel) ranks. Unexpectedly, however, before any final decisions were made, a nationwide coal strike began. Although defendants were aware that the contract between the United Mine Workers Union and the coal operators would expire on September 30, 1971, they did not anticipate a strike, since there had been none of this nature since 1949. Moreover, early indications were that the parties would be able to agree on a contract.

The coal strike represented a severe financial threat to the defendants. Coal constituted approximately 50% of their traffic and 35–40% of their operating revenue. Since it appeared that the strike would be protracted, defendants believed they should take immediate action to reduce their expenses.

Earlier, in September, 1971, Mr. Norman Halpern, Assistant Vice President-Executive Department ordered that no new non-contract employees could be hired without the specific approval of Mr. Watkins. Other methods for reducing the size of the work force were also discussed. Most were rejected for a variety of legitimate reasons.

Nevertheless, once the strike began, railroad supervisors began to expedite the

---

**2.** The Rule 60(b) motion in the case *sub judice,* like *Patterson,* was requested on the basis of newly announced Supreme Court decisions and involves allegations of discriminatory practices affecting hundreds of people. *Nunnery,* on the other hand, dealt with a single claimant. Comparatively speaking, the public policy questions here are at least as significant as they were in *Patterson. Patterson* and *Nunnery* are Fourth Circuit cases.

**3.** In *Standard Oil Co. of California v. United States,* 429 U.S. 17, 97 S.Ct. 31, 50 L.Ed.2d 21 (1976), the Supreme Court ruled that a District Court could reopen a case which had been reviewed on appeal without seeking leave from the appellate court.

**4.** On December 17, 1962, the Interstate Commerce Commission approved the acquisition by C & O of B & O through the purchase of B & O capital stock. Effective February 4, 1963, management of the railroads was consolidated.

force-reduction process. Many hours were spent deliberating so that a fair and humane program could be developed. The interests of the employees and their families were foremost among management's many concerns. The first conclusion they reached was that a reduction of 20% of their contract work force was necessary. These workers comprised 93% of defendants' employees. Management also decided that a comparably drastic reduction in the non-contract group was required. Other employees would have to be furloughed.

Preliminarily, all poor performers were eliminated, but this resulted in a meager 1% reduction. The next step was to attempt to pinpoint and permanently dissolve as many jobs as possible and to consolidate the rest.

One of the criteria used to select individuals to be terminated was "pension entitlement." Through pension entitlement, management designated individuals who would receive substantial pension benefits if retired involuntarily. They decided that these employees would be less adversely affected by the loss of a job than individuals who had no reserves in the form of a pension. Hopefully, this would reduce the suffering caused by the entire process. Of the employees terminated, approximately 142 were selected because they were already entitled to substantial pension benefits. Despite this program, overall the reduction in force affected a smaller percentage of employees in the 40–65 age group protected by the ADEA than those under age 25, of whom almost ⅔ were terminated.

Several other methods of reducing the size of the work force were also considered at that juncture as well, but were rejected either because they did not address defendants' root problem (overstaffing) or because of the lack of empirical data necessary to implement them. For example, defendants did not attempt to rank their employees by quality of performance since this would have been impractical, if not impossible under the circumstances. Further, although a number of employees were furloughed, the number selected was decidedly low. A long term, permanent solution was what management deemed necessary. Finally, selection on the basis of reverse seniority was not possible, apparently due to the absence of a collective bargaining agreement.

During the period of time in which the feasibility of using pension entitlement as a criterion for selecting employees for termination was discussed, defendants' law department was consulted as to the legality of the proposed reduction. At that time Mr. Owen Clarke was defendants' Vice-President of Personnel and Labor Relations and an experienced attorney. Mr. Frank Householder was an Assistant Vice-President in charge of Equal Employment Opportunity Services. Together, they discussed the effect of the ADEA upon the pension entitlement plan. Their conclusion, based upon published opinions of the Wage-Hour Administrator, Department of Labor, was that the proposed reduction was exempted from the ADEA under the provisions of § 4(f)(2). Mr. Watkins was advised of this determination, and as a consequence, he and other top management officials decided to go forward as proposed. In accordance with this plan, most of the defendants' "pension entitlement" employees were terminated between mid-October, 1971, and March 1, 1972.

The coal strike ended November 15, 1971, shortly after the pension entitlement reductions began. Nevertheless, defendants' Board of Directors, for the first time since 1922, advised their stockholders that as a result of the strike, the companies would not pay a dividend in the fourth quarter of 1971.

In the meantime, beginning in December, 1971, the Department of Labor instituted an investigation into defendants' actions, as they were alleged to have violated the ADEA. Government officials discussed the "pension entitlement" plan with the defendants on several occasions, as they had concluded it was unlawful. Shortly thereafter, the defendants began considering an alternative method of reducing their work force.

Mr. Clarke, who had become defendants' principal legal officer on May 1, 1972, was aware of an opinion letter written by the

Wage-Hour Administrator, dated September 6, 1968. He interpreted it to hold that reductions in mandatory retirement age under pension plans from 65 to 62 would not affect the availability of a Section 4(f)(2) exemption. Accordingly, when defendants' management consulted the Law Department, they were advised that such a reduction complied with the ADEA. On October 16, 1972, defendants' Board of Directors approved amendments to the pension plans which lowered the mandatory retirement age from 65 to age 62. These amendments were to take effect on January 1, 1974.

On June 19, 1974, the Department of Labor filed the complaint in this case charging the defendants with wilfully violating the ADEA. Since then, largely due to changes and clarifications in the law, this suit has been bouncing around in the Federal Courts. No alternative plan which would satisfy the plaintiff and the defendants has ever been proposed.

Additional facts operative to this latest opinion will be discussed below when necessary.

## LAW

*The Railroads' Involuntary Retirement of 142 Employees Due to Their Pension Entitlement.*

On the issue of whether or not the defendants were permitted to involuntarily retire 142 employees pursuant to the "pension entitlement" program, this Court ruled for the defendants. Although they had committed *prima facie* violations of the ADEA, their actions were held to be exempted by § 4(f)(2).

Section 4(f)(2) of the Act, 29 U.S.C. § 623(f)(2) provides in pertinent part:

It shall not be unlawful for an employer ... (2) to observe the terms of a bona fide seniority system or any bona fide employee benefit plan such as a retire-ment pension, or insurance plan, which is not a subterfuge to evade the purposes of this chapter, except that no such employee benefit plan shall excuse the failure to hire any individual.

The three essential elements are that an employer must (1) observe the terms (2) of a *bona fide* retirement plan (3) that is not a subterfuge to evade the purposes of the Act. If any element is absent, the exception does not apply.

Central to this Court's opinion that the railroads "observed the terms" was the finding that they always had the right to terminate their employees prior to age 65 even though there were no express provisions in the pension plan to that effect. The Fourth Circuit reversed and held that as a matter of law, to observe the terms of a *bona fide* pension plan there must be an explicit provision in the plan giving the employer the power. *See E.E.O.C. v. Baltimore and Ohio R. Co.,* 632 F.2d 1107, 1111 (4th Cir.1980). Several other courts have adopted this same legal conclusion. *See e.g. E.E.O.C. v. County of Santa Barbara,* 666 F.2d 373 (9th Cir.1982); *Benzel v. Valley National Bank of Arizona,* 633 F.2d 1325 (9th Cir.1980); *see also Sexton v. Beatrice Foods Co.,* 630 F.2d 478, 482 (7th Cir.1980).[5] Nothing would prevent, however, a plan from permitting the employer a certain degree of discretion, so long as it is pursuant to the terms of a *bona fide* plan. *See United Air Lines, Inc. v. McMann,* 434 U.S. 192, 98 S.Ct. 444, 54 L.Ed.2d 402 (1977); *Carpenter v. Continental Trailways,* 635 F.2d 578 (6th Cir.1980), *cert. denied,* 451 U.S. 2320, 101 S.Ct. 2320, 68 L.Ed.2d 844 (1981); *Gonsalves v. Caterpillar Tractor Co.,* 634 F.2d 1065 (7th Cir.1980), *cert. denied,* 451 U.S. 920, 101 S.Ct. 1999, 68 L.Ed.2d 312 (1981); *Sexton v. Beatrice Foods Co., supra; Smart v. Porter Paint Co.,* 630 F.2d 490 (7th Cir.1980); *Jensen v. Gulf Refining & Marketing Co.,* 623 F.2d 406 (5th Cir.1980); *Marshall v. Hawaiian Telephone Co.,* 575

---

5. In *Sexton v. Beatrice Foods Co., supra,* the United States Court of Appeals for the Seventh Circuit seemed to suggest that where an employer had the historical right to terminate an employee considering his pension entitlement, an express provision in the plan itself might not be necessary. 630 F.2d at 484–486. Clearly, that was the legal conclusion of this Court which the Fourth Circuit rejected.

F.2d 763 (9th Cir.1978); *Zinger v. Blanchette,* 549 F.2d 901 (3d Cir.1977); *cert. denied* 434 U.S. 1008, 98 S.Ct. 717, 54 L.Ed.2d 750 (1978).

■ Inasmuch as the Fourth Circuit's conclusion that an express provision in the plan was necessary as a matter of law, and it remains this Court's finding of fact that no such provision existed either in the B & O or the C & O plans, the defendants did not "observe the terms" under Section 4(f)(2) of the ADEA. In *Pullman-Standard v. Swint,* discussed *infra,* the Supreme Court held, among other things, that "Rule 52 [F.R.Civ.P.] broadly requires that findings of fact not be set aside unless clearly erroneous .... The rule does not apply to conclusions of law." 102 S.Ct. at 1789. Accordingly, the defendants' termination of 142 employees on the basis of their pension entitlement was unlawful. The effect of the Portal-to-Portal Act on this decision will be discussed *infra.*

*The Railroads' Decision to Lower the Mandatory Retirement Age.*

After the defendant railroads were advised by the Department of Labor that their "pension entitlement" program was in possible violation of the ADEA, they amended the company pension plans by reducing the mandatory retirement level from age 65 to age 62. This Court considered the Department's allegation that this amendment violated the ADEA and held the railroads' new policies were exempted by § 4(f)(2). They had (1) "observed the terms" of a (2) *bona fide* plan, and their decision was (3) not a subterfuge to avoid the purposes of the ADEA.

With regard to the issue of subterfuge, and considering the extenuating circumstances at the time, it was this Court's opinion the defendants sought to guarantee every employee either his job or a substantial retirement benefit which was adjusted to pay even more than the pre-plan entitlement. This benevolent attitude was pervasive throughout the defendants' reorganiza-tion process. The testimony of the witnesses demonstrated these decisions were influenced by economics, not age.

In a similar case the United States Court of Appeals for the Third Circuit suggested:

The primary purpose of the Act is to prevent age discrimination in *hiring* and *discharging* workers. There is, however, a clear, measurable difference between outright discharge and retirement, a distinction that cannot be overlooked in analyzing the Act. While discharge without compensation is obviously undesirable, retirement on an adequate pension is generally regarded with favor.

*Zinger v. Blanchette,* 549 F.2d at 901.

The Fourth Circuit panel which reviewed this matter on appeal, reversed. It held, in pertinent part:

[L]eaving aside the question of possible retroactivity of the 1978 amendment to section 4(f)(2), the 4(f)(2) defense of the amended retirement plan is unavailing— the railroad companies' 1972 amendments to the plans, unlike the original plans and the previous amendments, is a "subterfuge to evade the purpose of this chapter." *E.E.O.C. v. Baltimore and Ohio R. Co.,* 632 F.2d at 1112–1113.

To support this reversal the Appeals Court then reconstructed the evidence and concluded there was subterfuge by "design." *Id.*

■ There is by now little doubt that a finding of discriminatory intent, subterfuge, or lack thereof is a finding of fact. *See Pullman-Standard v. Swint, supra; United Airlines, Inc. v. McMann, supra; E.E.O.C. v. Home Ins. Co.,* 672 F.2d 252 (2d Cir.1982); *see also: Cline v. Roadway Express, Inc.,* 689 F.2d 481, 485 (4th Cir.1982) ("The dispositive liability issue was the narrow motivational one central to any ADEA claim ...").

■ Rule 52 of the Federal Rules of Civil Procedure requires that findings of fact not be set aside unless they are declared clearly erroneous.[6] *Pullman-Standard v. Swint, su-*

---

6. In *Cline v. Roadway Express, Inc., supra,* the Fourth Circuit paraphrased the rule to say a

finding of fact may not be disturbed unless the

*pra.* If a district court's factual conclusions are found clearly erroneous, the appeals court may not then reach an outcome by independently considering the totality of circumstances, as it sees them. Instead, it must remand to the district court. *Id.*

Even the most cursory reading of the Fourth Circuit's panel opinion in this case shows this Court's original findings were not held clearly erroneous. Indeed, considering the unique circumstances in this case, it is difficult to understand how they could be. There was absolutely no motive on the employers' part to discharge anyone because of their age. Rather, as far as the defendants were concerned, theirs was a humane economic, rather than an age based decision. The objective evidence supports this contention. Contract and non-contract workers, young and old, were affected in the force-reduction process. Improved pensions were paid whenever possible. And the economic situation of the defendants' industry was such that they needed to take immediate, albeit drastic, action. Finally, even the panel on appeal agreed "there is nothing [inherently] sinister about a chief executive's design to 'cut the cloth to fit the pattern.'" *E.E.O.C. v. Baltimore and Ohio R. Co.,* 632 F.2d at 1113.

 In light of these facts and the established standard that post-Act decisions which have a discriminatory impact are not necessarily decisions made with a discriminatory intent, *see American Tobacco Company v. Patterson, supra,* this Court stands behind its original conclusion. The defendants' decision to reduce the mandatory retirement age of their employees from age 65 to age 62 was protected under Section 4(f)(2) of the ADEA.

*The Portal-to-Portal Act.*

An additional basis for this Court's original decision in favor of the defendant railroads was their Portal-to-Portal defense. Section 7(e) of the ADEA, 29 U.S.C. § 626(e), incorporates Section 10 of the Por-

appeals court is "left with the definite and firm conviction that a mistake has been committed." *Id.,* at 486 *citing Commissioner v. Duberstein,*

tal-to-Portal Act of 1947, 29 U.S.C. § 259, which provides in pertinent part:

> In any action or proceeding ... no employer shall be subject to any liability of punishment ... if he pleads and proves that the act or omission complained of was *in good faith in conformity with and in reliance on* any written administrative regulation, order, ruling, approval, or interpretation, of the agency of the United States.... (Emphasis added)

 For an employer to successfully assert this defense, the bulletin allegedly relied upon and conformed with must be specific enough to cover the employment situation at issue. *Pilkenton v. Appalachian Regional Hospitals, Inc.,* 336 F.Supp. 334, 340 (W.D.Va.1971). Further, the employer must prove its reliance by objective, as opposed to subjective, evidence. *Clifton D. Mayhew Inc. v. Wirtz,* 413 F.2d 658 (4th Cir.1969).

The publications the defendant railroads relied upon had excerpts reading as follows:

> [T]he Act authorized involuntary retirement irrespective of age, provided that such retirement is pursuant to the terms of a retirement or pension plan meeting the requirements of Section 4(f)(2). The fact than an employer may decide to permit certain employees to continue working beyond the age stipulated in the formal retirement program does not, in and of itself, render an otherwise bona fide plan invalid insofar as the exception provided in section 4(f)(2) is concerned. 29 C.F.R. § 860.110 (First published Aug. 30, 1968).

> The lowering of the retirement age from 65 to 62 years for employees participating in a bona fide retirement plan would not affect the applicability of provisions authorizing retirement irrespective of age pursuant to retirement or pension plans, provided such plans are not a subterfuge to evade the purposes of the Act. Opinion Letter of Wage-Hour Administrator, September 6, 1968.

363 U.S. 278, 291, 80 S.Ct. 1190, 1199, 4 L.Ed.2d 1218 (1960).

[T]he term "bona fide" given its generally understood meaning, describes a plan established in good faith to provide certain fringe benefits for employees, and not as a device or subterfuge to avoid the purposes of the Act. Opinion Letter of Wage-Hour Administrator, June 29, 1971.

After considering the defendants' in court testimony, this Court held they relied in good faith on and acted in conformity with these and other "Portal-to-Portal materials." The Fourth Circuit's reversal of these findings is discussed below.

**A. The 1971 Force Reduction/Pension Entitlement.**

The railroads argue that the Fourth Circuit panel erred under *Pullman-Standard v. Swint, supra,* by reversing this Court's finding without characterizing it as "clearly erroneous." There is no question, and the plaintiff does not dispute, that "reasonable good faith reliance" is a question of fact. *Hodgson v. Miller Brewing Co.,* 457 F.2d 221, 228 (7th Cir.1972). What the plaintiff contends, however, is that the Court of Appeals accepted this Court's findings of fact, but merely interpreted them differently. Therefore, according to the plaintiff, the Court of Appeals' final decision was a legal conclusion.

■ This Court finds the plaintiff's position untenable. The issue of "good faith reliance" is a pure question of fact, not a mixed question of fact and law. *Cf. Pullman-Standard v. Swint,* 102 S.Ct. 1790–1791. The Court of Appeals understood it as such, and after independently considering the record, merely disagreed with this Court's conclusion. The Fifth Circuit made the same mistake in *Pullman-Standard v. Swint. Id.* Nevertheless, this error does not relieve the defendants from liability.

■ In order to successfully assert a Portal-to-Portal Act defense, the employer bears the burden of proving (1) good faith reliance and (2) conformity with the writing relied upon. Even assuming the plaintiff

agrees with this Court that the defendants acted in good faith, in lieu of the ruling *infra* that defendants did not "observe the terms," it can no longer be said the "conformity" element has been met. As the Fourth Circuit panel stated at 632 F.2d at 1112:

The interpretive bulletin, on which the defendant railroad companies claim reliance, refers to the terms of the pension plan itself. The bulletin instructs that involuntary retirement irrespective of age is permissible, if pursuant to the terms of a pension plan. Assuming, as we have here held, that the railroad companies' plan contain no such authorization, it is circular reasoning to argue that the railroad companies could involuntarily retire protected employees on the basis of the Secretary's interpretive bulletin directing them to examine their plans.

Accordingly, the defendants' motion to vacate will be denied as it pertains to the pension entitlement program.

**B. The 1972 Force Reduction/Age Reduction.**

The September 6, 1968, opinion letter cited above specifically sanctioned an employer's lowering the mandatory retirement age in a pension benefit plan from age 65 to age 62. In good faith reliance on that opinion letter, the defendants acted accordingly. *Marshall v. Baltimore and Ohio R. Co.,* 461 F.Supp. at 376–377. In reaching that particularly obvious factual conclusion, this Court rejected the Department of Labor's argument that their filing of suit removed any right of the defendant to rely on that document.[7]

Ironically, the same Fourth Circuit panel which found "nothing sinister about a chief executive's design to 'cut the cloth to fit the pattern,'" and which agreed drastic action by the defendants was necessary, reversed and adopted the plaintiff's position that their investigation of the defendants' force-reduction plan foreclosed defendants' right to rely on the published opinions of the

---

**7.** The opinion letter has never been withdrawn and is consistent with many of the ADEA cases

cited *supra. See e.g. United Airlines v. McMann, supra.*

Wage-Hour Administrator, and that as a result, the defendants failed to act in good faith. *E.E.O.C. v. Baltimore and Ohio R. Co.,* 632 F.2d at 1113.

 There is no question that this Court's original finding that the defendants acted in strict conformity with the opinion letters was a finding of fact. Similarly, the decision of this Court that the defendants acted in good faith when reducing the mandatory retirement age of its employees, even while under investigation, was also a finding of fact. In the absence of a ruling by the Court of Appeals that these conclusions were clearly erroneous, they will not be disturbed. *See Pullman-Standard v. Swint, supra.*

The defendant's motion to vacate will therefore be granted in this respect.

## CONCLUSION

For the reasons stated in this opinion, the defendants' motion to vacate the panel opinion of the Fourth Circuit will be granted in part and denied in part. A separate order will be entered consistent with the rulings of this opinion Memorandum.

## ORDER

In accordance with the foregoing Memorandum and for the reasons stated therein, IT IS, this 17th day of February, 1983, by the United States District Court for the District of Maryland, ORDERED:

(1) The defendants' termination of 142 individuals in the 1971 force reduction due to their pension entitlement was not exempted by Section 4(f)(2) of the ADEA; and

(2) The defendants' termination of 142 individuals in the 1971 force reduction due to their pension entitlement is not exempt from liability under Section 10 of the Portal-to-Portal Act; and

(3) The defendants' amendments to their pension plans reducing the mandatory retirement age of its employees from age 65 to age 62 is exempt by the ADEA by virtue of Section 4(f)(2); and

(4) The defendants' amendments to their pension plans reducing the mandatory retirement age of its employees from age 65 to age 62 is conduct exempt from liability pursuant to Section 10 of the Portal-to-Portal Act.